IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

AUG 20 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | Criminal No. 1:20-cr-193 |
| | ) | |
| PETER RAFAEL DZIBINSKI DEBBINS, | ) | Count 1: 18 U.S.C. § 794(a) & (c) |
| a/k/a "Ikar Lesnikov," | ) | Conspiracy to Gather or Deliver Defense Information to Aid a Foreign Government |
| | ) | |
| Defendant. | ) | Forfeiture Notice, 18 U.S.C. § 794(d) |

**INDICTMENT**

August 2020 Term – At Alexandria

THE GRAND JURY CHARGES THAT:

At all times material to this Indictment, except as otherwise indicated:

**General Allegations**

1. Peter Rafael Dzibinski DEBBINS ("DEBBINS") is a citizen of the United States who was born in Minnesota. His mother was born in the former Soviet Union. DEBBINS developed an interest in the Russian Federation (hereinafter, "Russia") at least in part due to his mother's heritage.

2. DEBBINS first visited Russia in 1994, when he was 19 years old. Thereafter, he traveled to Russia in 1995, 1996-1997, 1997-1998, 1999, 2000, 2003, 2008, and 2010.[1]

3. During one of his early visits to Russia, DEBBINS met his now-wife in Chelyabinsk, a city in Russia with a nearby Russian air force base. DEBBINS and his wife

---

[1] When the Grand Jury alleges in this Indictment that an event occurred on a specific date, or in a specific month or year, the Grand Jury means to convey that the event occurred "on or about" that date, month, or year.

married in Chelyabinsk in November 1997. DEBBINS's father-in-law was an officer in the Russian military and lived in Chelyabinsk. DEBBINS's wife, who was born in Russia, naturalized as a U.S. citizen in July 2010.

A. **DEBBINS's Service in the U.S. Army and Security Clearances**

4. DEBBINS served active duty in the U.S. Army from 1998 until 2005.

5. Prior to starting his active duty service, DEBBINS was a member of the Reserve Officers' Training Corps (ROTC) at the University of Minnesota. During this time, DEBBINS signed an "Oath of Office" as a Reserve Commissioned Officer, in which he swore to "support and defend the Constitution of the United States against all enemies, foreign and domestic," and to "bear true faith and allegiance to the same."

6. DEBBINS graduated from the University of Minnesota in September 1997, and received a reserve commission in the U.S. Army. In July 1998, DEBBINS began his active duty service in the Army. Between his graduation in September 1997 and returning to the United States to start his active duty service in July 1998, DEBBINS lived and worked in Russia.

7. From December 1998 to December 1999, DEBBINS deployed to the Republic of Korea (hereinafter, "South Korea") as a Lieutenant in the 4th Chemical Company.

8. From December 1999 to April 2001, DEBBINS served as a Lieutenant with the 7th Chemical Company at Fort Polk, Louisiana.

9. Around that time, DEBBINS was selected for the U.S. Army Special Forces. In June 2003, after completion of his training, DEBBINS was assigned as a Captain to the 1st Battalion, 10th Special Forces Group stationed in Germany.

10. DEBBINS, who had been granted a SECRET security clearance in 1996, was granted a TOP SECRET security clearance, with Sensitive Compartmented Information (SCI)

access, in August 2004.

11. With his Special Forces unit, DEBBINS deployed to the Republic of Azerbaijan in 2004. DEBBINS's unit was responsible for operations in both Azerbaijan and the Republic of Georgia. During this deployment, DEBBINS was investigated for a security violation and removed from his command in Azerbaijan. DEBBINS's security clearance was subsequently suspended in late 2004 or early 2005, around or soon after the time he was removed from his command in Azerbaijan.

12. DEBBINS was honorably discharged from active duty in the U.S. Army in November 2005. DEBBINS served in the U.S. Army inactive reserve from December 2005 until 2010.

13. After his discharge from active duty service in the U.S. Army, DEBBINS lived in Minnesota from 2005 to 2010, where he worked for a Ukrainian steel manufacturer and a transportation company.

B. **Classified Information**

14. As of 2008, Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 signed on March 25, 2003, governed the system for classifying, safeguarding, and declassifying national security information.[2] Under that Executive Order, national security information was classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL." National security information was information owned by, produced by, produced for, and under the control of the U.S. Government, and that was classified as follows:

    a. Information was classified as TOP SECRET if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify

---

[2] Executive Order 13526, dated December 29, 2009, replaced Executive Order 12958 (as amended) and continued the same definitions and criteria for the levels of classification.

and describe.

b. Information was classified as SECRET if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security that the original classification authority was able to identify and describe.

c. Information was classified as CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to cause damage to the national security that the original classification authority was able to identify and describe.

15. Access to national security information classified at any level could be further restricted through compartmentation in SCI categories. Only individuals possessing both the appropriate security clearance and specific, additional permissions could have authorized access to SCI.

16. Information classified at any level could only be lawfully accessed by persons determined by an appropriate U.S. government official to be eligible for access to classified information, who had signed an approved nondisclosure agreement, who received a security clearance, and who had a "need to know" the classified information.

17. In addition, classified information at times was also subject to dissemination controls that further restricted the distribution of the information. As relevant here, classified information marked "NF" or "NOFORN," which stood for "No Foreign Dissemination," denoted that dissemination of the information was limited to U.S. persons.

C. Russian Intelligence Services and Associated Terms

18. The intelligence services of the Russian government include both civilian and military components. The Main Intelligence Directorate of the General Staff, commonly known as the "GRU," and the Federal Security Service, or "FSB," are two of the primary Russian intelligence services.

19. The GRU is Russia's primary military intelligence agency. The GRU provides strategic intelligence to support the Russian military. Among other activities, the GRU obtains

and provides information concerning foreign nations'—particularly the United States'—military preparedness, military and strategic infrastructure, capabilities, force deployment, personnel, policy, weaponry, and new technologies.

20. The FSB is Russia's primary domestic intelligence and security service. It has wide-ranging responsibilities that include counterintelligence, counterterrorism, economic and ecological security, and the protection of state secrets.

D. **DEBBINS's Initial Meetings with a Russian Intelligence Service in 1996**

21. DEBBINS traveled to Russia in 1996 as part of an independent study program and lived in Chelyabinsk.

22. In December 1996, an agent of the Russian intelligence service contacted DEBBINS and asked to meet with him. DEBBINS met with the agent, and they discussed DEBBINS's participation in the ROTC program and his plans for military service.

23. DEBBINS subsequently had at least two meetings with one or more additional Russian intelligence agents in December 1996, including an agent of the Russian intelligence service who was from Samara, Russia (hereinafter, "RIS 1"). As a cover for their meetings, the Russian intelligence service directed DEBBINS to tell his girlfriend that he was meeting with a professor on campus.

24. During DEBBINS's meetings with the Russian intelligence service in December 1996, DEBBINS and RIS 1 discussed DEBBINS's ambitions, including his plans for military service. DEBBINS informed RIS 1 that he was a "son of Russia" and was trying to learn about Russia. RIS 1 tasked DEBBINS with getting the names of four nuns at a Catholic church that DEBBINS visited. DEBBINS subsequently visited the nuns, obtained their names, and provided the names to RIS 1.

25. During DEBBINS's meetings with the Russian intelligence service in December

1996, DEBBINS described his political opinions, which were pro-Russian and anti-American.

26. During DEBBINS's meetings with the Russian intelligence service in December 1996, a Russian intelligence agent also asked DEBBINS what he told his ROTC unit about his connections to Russia. DEBBINS answered he was being very discrete. A Russian intelligence agent instructed DEBBINS not to disclose his interactions with the Russian intelligence service.

E. **DEBBINS's Meetings with the Russian Intelligence Service from 1997 to 1998**

27. DEBBINS traveled to Russia again in September 1997, after graduating from the University of Minnesota.

28. In October 1997, DEBBINS met with agents of the Russian intelligence service, including RIS 1, at an office on the Russian military base in Chelyabinsk. During the meeting, the Russian intelligence agents gave DEBBINS a code name, "Ikar Lesnikov." DEBBINS wrote a statement stating that he wanted to "serve Russia" and signed the statement with his code name. One of the Russian intelligence agents (hereinafter, "RIS 2") encouraged DEBBINS to visit him in Samara before DEBBINS returned to the United States.

29. After the meeting in October 1997, DEBBINS worked in Russia until he was called to start his active duty service in the U.S. Army in July 1998.

30. Before leaving Russia, DEBBINS contacted RIS 2 and informed him about his plans to return to the United States. RIS 2 again urged DEBBINS to visit him in Samara before departing. DEBBINS agreed and met RIS 2 at a train station in Samara. RIS 2 introduced DEBBINS to another agent with the Russian intelligence service (hereinafter, "RIS 3").

31. RIS 3 entertained DEBBINS for several days in the Volga region of Russia, including at a countryside resort in the area. During this time, RIS 3 encouraged DEBBINS to serve well in the U.S. Army.

32. Before DEBBINS departed for the United States, the Russian intelligence service

provided him a telephone number to use to contact it and instructed DEBBINS to use his code name if he did. DEBBINS told the Russian intelligence service that he would return to Russia when he was on leave.

### F. DEBBINS's Meeting with the Russian Intelligence Service in 1999

33. DEBBINS returned to Russia in June 1999 when he was on leave during his tour in South Korea. The first week he was in Russia, DEBBINS called RIS 2 and informed him that he was in Chelyabinsk.

34. DEBBINS subsequently met with RIS 2 in Chelyabinsk. During the meeting, DEBBINS asked RIS 2 which agency he worked for, and RIS 2 answered that he worked for the GRU. Until that point, DEBBINS had assumed he was meeting with agents of the FSB. From that point forward, DEBBINS understood that he was meeting with agents of the GRU.

35. During the meeting, RIS 2 asked DEBBINS for information about his unit in South Korea. DEBBINS provided information to RIS 2 about, among other things, the number of men in his platoon, the unit's assigned equipment, and the unit's mission.

36. During the meeting, DEBBINS told RIS 2 that he wanted to leave the U.S. Army. RIS 2, however, encouraged DEBBINS to remain in the military.

37. At one point during the meeting, RIS 2 questioned whether DEBBINS was actually a spy for a U.S. intelligence agency. DEBBINS denied the accusation, insisting that he loved and was committed to Russia. RIS 2 asked DEBBINS whether he would be willing to submit to a polygraph, and DEBBINS agreed. RIS 2 did not ultimately give him a polygraph. RIS 2 also asked whether DEBBINS would agree to employ electronic equipment for the Russian intelligence service, and DEBBINS agreed. Again, RIS 2 did not follow up on the request.

38. During the meeting, RIS 2 provided DEBBINS with an address in Samara and

told him to send a postcard as an emergency signal if he needed to make contact with the Russian intelligence service. RIS 2 instructed DEBBINS to use his code name on the postcard and a cover greeting like "Happy Victory Day" or "Happy Mother's Day."

39. During this time, DEBBINS sought to help Russia, as he considered himself pro-Russian and a loyal son of Russia. DEBBINS thought that the United States was too dominant in the world and needed to be cut down to size.

### G. DEBBINS's Meetings with the Russian Intelligence Service in 2000

40. DEBBINS returned to Russia around July 2000. After he arrived, an agent with the Russian intelligence service, "RIS 4," called DEBBINS in Moscow and introduced himself as RIS 2's friend. RIS 4 informed DEBBINS that RIS 2 sent his greetings but had accepted another job. RIS 4 was also from Samara but agreed to meet with DEBBINS in Moscow. DEBBINS met with RIS 4 at least twice.

41. During the meetings, DEBBINS informed RIS 4 that he was joining the U.S. Army Special Forces. RIS 4 encouraged DEBBINS to pursue the Special Forces. RIS 4 told DEBBINS he was of no use to the Russian intelligence service as an infantry commander.

42. During the meetings, RIS 4 asked DEBBINS for information about DEBBINS's unit at Fort Polk. DEBBINS provided RIS 4 with information about the unit's assigned equipment and mission.

43. During the meetings, RIS 4 also paid DEBBINS $1,000 as gratitude for his assistance to the Russian intelligence service. Initially, DEBBINS declined the payment, stating he had true love for Russia. However, DEBBINS ultimately accepted the money and signed for it using his code name.

### H. DEBBINS's Meetings with the Russian Intelligence Service in 2003

44. DEBBINS traveled to Russia again in August 2003. After arriving, DEBBINS

called a telephone number that the Russian intelligence service previously provided him. DEBBINS arranged a meeting with the Russian intelligence service at a hotel in Chelyabinsk. There, DEBBINS met with two agents of the Russian intelligence service whom he had not previously met (hereinafter, "RIS 5" and "RIS 6").

45. During the meeting, RIS 5 and RIS 6 asked DEBBINS about his unit, the 1st Battalion, 10th Special Forces Group. DEBBINS provided information about the number of companies and men in the unit, and their location and role.

46. During the meeting, RIS 5 and RIS 6 instructed DEBBINS not to take a polygraph and offered to give him training on how to deceive polygraphs. They further encouraged DEBBINS to continue pursuing a career in the Special Forces.

47. During the meeting, RIS 5 and RIS 6 gave DEBBINS a bottle of Cognac and a Russian military uniform as a gift.

48. At some point, RIS 5 informed DEBBINS that he was associated with the GRU.

I. **DEBBINS's Meetings with the Russian Intelligence Service in 2008**

49. DEBBINS traveled to Russia again from August to September 2008. During this time, DEBBINS was no longer serving active duty in the U.S. military. According to DEBBINS, he wanted to do business in Russia and sought the Russian intelligence service's assistance in doing so.

50. After arriving in Russia in August 2008, DEBBINS met with RIS 5 and another Russian intelligence agent also from Samara (hereinafter, "RIS 7") at least two or three times. According to DEBBINS, he informed RIS 5 and RIS 7 that he was finished with the U.S. Army and wanted to pursue business opportunities in Russia.

51. During the meetings in either 2008 or 2010, RIS 7 provided DEBBINS with the name of his cover company and gave DEBBINS a business card with contact information. RIS 7

9

instructed DEBBINS to tell his family that he was working with the cover company to explain any calls that he might have with the Russian intelligence service.

52. During the meetings with RIS 5 and RIS 7, DEBBINS provided them with information about, among other things, his former Special Forces unit's mission and activities in Azerbaijan and Georgia. This disclosure included information that was classified SECRET//NOFORN, meaning that the unauthorized disclosure of the information, including to foreign nationals, was prohibited and reasonably could be expected to cause serious damage to U.S. national security.

53. During the meetings with RIS 5 and RIS 7, DEBBINS also provided them with the names of and information about a number of his former Special Forces team members. DEBBINS understood that RIS 5 and RIS 7 sought this information for the purpose of evaluating whether to approach the team members to see if they would cooperate with the Russian intelligence service. DEBBINS identified for RIS 5 and RIS 7 at least one specific Special Forces team member whom he thought they could approach.

54. During the meetings with RIS 5 and RIS 7, DEBBINS also provided them with the names of two U.S. counterintelligence officers who had previously attempted to recruit DEBBINS to participate in a program.

55. DEBBINS provided information to the Russian intelligence agents in 2008 at least in part because he was angry and bitter about his time in the U.S. Army. DEBBINS also thought that Russia needed to be built up and that America needed to be "cut down to size." DEBBINS further provided this information because he wanted to obtain the Russian intelligence service's assistance in doing business in Russia.

56. During the meetings, RIS 5 asked DEBBINS whether he had any U.S. military

field manuals. After DEBBINS confirmed that he did, RIS 5 tasked DEBBINS with scanning the field manuals, putting them on a flash drive, and bringing the flash drive to their next meeting.

### J. DEBBINS's Applications for a Security Clearance and Correspondence with the Russian Intelligence Service in 2008 and 2009

57. DEBBINS returned to the United States from Russia in September 2008.

58. The following month, in October 2008, DEBBINS submitted a "Questionnaire for National Security Positions (Standard Form-86)," commonly known as an "SF-86," in connection with a background investigation for a security clearance. The SF-86 included a question that required him to disclose any contacts he ever had with a foreign government, an establishment of a foreign government, or representatives of a foreign government. DEBBINS did not disclose his contacts with the Russian intelligence service or any of its agents in response to the question (or any other question).

59. Beginning in April 2009, DEBBINS and RIS 7 began exchanging a series of emails that, on their face, referenced potential business opportunities. In an April 2009 email, RIS 7 encouraged DEBBINS to travel to Russia for a visit, but DEBBINS did not commit to the trip. Later, in August 2009, RIS 7 sent an email to DEBBINS inviting DEBBINS to travel to Russia and offering to pay his expenses. DEBBINS, however, did not travel at that time.

60. In January 2010, an Adjudicator with the U.S. Army Central Personnel Security Clearance Facility sent DEBBINS a letter notifying him that he had been granted a TS/SCI security clearance. The letter, however, noted concerns about DEBBINS's business connections and father-in-law, and his prior relief of command in Azerbaijan. The letter cautioned DEBBINS that "[s]ituations such as those . . . have been exploited in the past by the intelligence services of foreign countries." The letter warned that "[e]xtensive association with foreign

nationals increases the opportunities for [him] to be the target of a foreign intelligence service and, therefore, should be avoided." The letter emphasized DEBBINS's "responsibilities for reporting any possible contact by representatives or citizens of foreign countries."

61. In August 2010, DEBBINS sent an email to RIS 7 to inform him that he planned to travel to Russia in September 2010. DEBBINS asked to meet with RIS 7 to discuss a business matter. DEBBINS and RIS 7 subsequently exchanged a series of emails regarding DEBBINS's travel plans and arranging a meeting in Chelyabinsk.

K. **DEBBINS's Meetings with the Russian Intelligence Service in 2010**

62. On September 8, 2010, DEBBINS arrived in Russia. Three days later, on September 11, 2010, DEBBINS emailed RIS 7, informing him that he was in Chelyabinsk and would remain there until September 22.

63. While in Russia in September 2010, DEBBINS met RIS 5 and RIS 7 at least three times. During these meetings, DEBBINS reemphasized that he wanted to pursue business opportunities in Russia. RIS 5 and RIS 7 agreed to try to help him. RIS 5, however, encouraged DEBBINS to seek employment with the U.S. Government.

64. During the meetings, RIS 5 and RIS 7 asked whether DEBBINS brought the field manuals that RIS 5 had previously requested. DEBBINS explained that he did not bring the field manuals because he was scared the U.S. Department of Homeland Security would have stopped him at the airport and seized his electronic devices.

65. During the last meeting, RIS 7 introduced DEBBINS to a Russian national who, according to DEBBINS, was involved in finding investors for an infrastructure project (hereinafter, "RUSSIAN NATIONAL"). DEBBINS understood the RUSSIAN NATIONAL to be a businessman connected to the Russian intelligence service. According to DEBBINS, RIS 7 and the RUSSIAN NATIONAL asked DEBBINS to find U.S. investors for the infrastructure

project.

66. From September 2010 until at least January 2011, DEBBINS and the RUSSIAN NATIONAL exchanged emails, many of which referenced the infrastructure project and/or other business projects.

67. On November 5, 2010, the RUSSIAN NATIONAL emailed DEBBINS, stating that he had not heard from DEBBINS in a long time. The RUSSIAN NATIONAL specifically told DEBBINS that "Ivan," the first name of RIS 7, sent his greetings.

68. Three days later, on November 8, 2010, DEBBINS responded to the RUSSIAN NATIONAL and informed him that he was about to move to "the capital," meaning Washington, D.C.

69. On January 3, 2011, DEBBINS sent the RUSSIAN NATIONAL an email stating that he had moved to "the capital," meaning Washington, D.C., and that he was working on their business matter.

70. In addition, after returning from Russia in September 2010, DEBBINS contacted individuals in the United States about the infrastructure project—including a former Special Forces team member in October 2010—and held himself out as the U.S. contact for the project and the RUSSIAN NATIONAL as the Project Manager.

L. **DEBBINS's Attempts to Conceal His Relationship with the Russian Intelligence Service**

71. During the period between December 1996 and January 2011, DEBBINS failed to report his contacts with the Russian intelligence service to the U.S. Government, even when he was required to do so.

72. For example, DEBBINS submitted an SF-86 to the U.S. Government in April 2003 as part of a background investigation. The SF-86 included a question that required him to

disclose his contacts with any foreign government, establishment of a foreign government, or representatives of a foreign government. DEBBINS did not disclose his contacts with the Russian intelligence service or any of its agents in the SF-86.

73. As described in paragraph 58, DEBBINS also failed to disclose his contacts with the Russian intelligence service when required to do so on the SF-86 that he submitted in October 2008.

74. Moreover, after his travel to Russia in 2000 and 2003, DEBBINS was interviewed about his travel by military S-2 officers—officers responsible for information security in a U.S. Army unit and interviewing individuals following individual travel to identify potential security threats. During his interviews with the S-2 officers, DEBBINS did not disclose his contacts with the Russian intelligence agents, even when asked about his contacts there.

## COUNT ONE

### CONSPIRACY TO GATHER OR DELIVER DEFENSE INFORMATION TO AID A FOREIGN GOVERNMENT

THE GRAND JURY FURTHER CHARGES THAT:

A. Paragraphs 1 – 74 of the General Allegations section of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

B. From in or around December 1996 to in or around January 2011, the exact dates being unknown to the Grand Jury, both dates being approximate and inclusive, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, the defendant, PETER RAFAEL DZIBINSKI DEBBINS, also known as "Ikar Lesnikov," who after the conduct required for the offense occurred is expected to be arrested in and first brought to the Eastern District of Virginia, and whose last known address is in the Eastern District of Virginia, did unlawfully and knowingly conspire with others, known and unknown to the Grand Jury, to communicate, deliver, and transmit to a foreign government, to wit: the Russian Federation, and representatives, officers, agents, employees, subjects, and citizens thereof, directly and indirectly, documents, writings, and information relating to the national defense of the United States, with the intent and reason to believe that such documents, writings, and information were to be used to the injury of the United States and to the advantage of a foreign government, namely, the Russian Federation.

C. In furtherance of the conspiracy, and to accomplish its objects, DEBBINS and his conspirators committed overt acts, including but not limited to those described in the General Allegations of this Indictment.

(All in violation of Title 18, United States Code, Section 794(a) & (c).)

## FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT THE PROPERTY DESCRIBED BELOW IS SUBJECT TO FORFEITURE:

1. The defendant, PETER RAFAEL DZIBINSKI DEBBINS, is notified pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, that if he is convicted of the offense set forth in Count One, he shall forfeit to the United States pursuant to Title 18, United States Code, Section 794(d), the following property:

   a. Any property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as the result of such violation; and

   b. Any property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of such violation.

2. Pursuant to Title 21, United States Code, Section 853(p), the defendant shall forfeit substitute property, up to the value of the property subject to forfeiture if the property subject to forfeiture (i) cannot be located upon the exercise of due diligence; (ii) has been transferred, sold to, or deposited with a third party; (iii) has been placed beyond the jurisdiction of the Court; (iv) has been substantially diminished in value; or (v) has been commingled with other property that cannot be divided without difficulty.

3. The property subject to forfeiture includes at least $1,000.00 in U.S. currency, representing proceeds the defendant obtained in the course of the conspiracy and property used to facilitate the commission of the violations of Title 18, United States Code, Section 794, as alleged in Count One of this Indictment.

(In accordance with Title 18, United States Code, Section 794(d).)

A TRUE BILL

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

_____                                    _____
DATE                                                       FOREPERSON

      G. Zachary Terwilliger
      United States Attorney

By: _____
      Thomas W. Traxler
      James L. Trump
      Assistant United States Attorneys

      David Aaron
      Trial Attorney, National Security Division
      U.S. Department of Justice