

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

    v.

PETER RAFAEL DZIBINSKI DEBBINS,
    a/k/a "Ikar Lesnikov,"

    Defendant.

Case No. 1:20-cr-193

## STATEMENT OF FACTS

The United States and the defendant, PETER RAFAEL DZIBINSKI DEBBINS (also known as "Ikar Lesnikov") (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.    From in or around December 1996 to in or around January 2011, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, the defendant, also known as "Ikar Lesnikov," who after the conduct required for the offense occurred was arrested in and first brought to the Eastern District of Virginia, and whose last known address is in the Eastern District of Virginia, did unlawfully and knowingly conspire with others to communicate, deliver, and transmit to a foreign government, to wit: the Russian Federation (hereinafter, "Russia"), and representatives, officers, agents, employees, subjects, and citizens thereof, directly and indirectly, documents, writings, and information relating to the national defense of the United States, with the intent and reason to believe that such documents, writings, and information were to be used to the injury of the United States and to the advantage of a foreign government, namely, Russia.

1

2.      As of 2008, Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 signed on March 25, 2003, governed the system for classifying, safeguarding, and declassifying national security information.[1]   Under that Executive Order, national security information was classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL."   National security information was information owned by, produced by, produced for, and under the control of the U.S. Government, and that was classified as follows:

      a.      Information was classified as TOP SECRET if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify and describe.

      b.      Information was classified as SECRET if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security that the original classification authority was able to identify and describe.

      c.      Information was classified as CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to cause damage to the national security that the original classification authority was able to identify and describe.

3.      Access to national security information classified at any level could be further restricted through compartmentation in Sensitive Compartmented Information (SCI) categories. Only individuals possessing both the appropriate security clearance and specific, additional permissions could have authorized access to SCI.

---

[1] Executive Order 13526, dated December 29, 2009, amended Executive Order 13292 and continued the same definitions and criteria for the levels of classification.

4.      Information classified at any level could only be lawfully accessed by persons determined by an appropriate U.S. government official to be eligible for access to classified information, who had signed an approved nondisclosure agreement, who received a security clearance, and who had a "need to know" the classified information.

5.      In addition, classified information at times was also subject to dissemination controls that further restricted the distribution of the information.  As relevant here, classified information marked "NF" or "NOFORN," which stood for "No Foreign Dissemination," denoted that dissemination of the information was limited to U.S. persons.

6.      The defendant is a citizen of the United States who was born in Minnesota.  His mother was born in the former Soviet Union.  The defendant developed an interest in Russia at least in part due to his mother's heritage.

7.      The defendant first visited Russia in 1994, when he was 19 years old.  During one of his early visits to Russia, the defendant met his now-wife in Chelyabinsk, a city in Russia with a nearby Russian air force base.  The defendant's father-in-law was an officer in the Russian military.

8.      The defendant attended the University of Minnesota, where he was a member of the Reserve Officers' Training Corps (ROTC).  The defendant was granted a SECRET security clearance in 1996.

9.      While a student at the University of Minnesota, the defendant traveled to Russia in 1996 as part of an independent study program and lived in Chelyabinsk.

10.     In December 1996, while the defendant was in Russia, an agent of a Russian intelligence service contacted the defendant and asked to meet with him.  The defendant met with

the agent, and they discussed the defendant's participation in the ROTC program and his plans for military service.

11.     The defendant subsequently had at least two meetings with one or more additional Russian intelligence agents in December 1996, including an agent of the Russian intelligence service who was from Samara, Russia (hereinafter, "RIS 1"). As a cover for their meetings, the Russian intelligence service directed the defendant to tell his girlfriend that he was meeting with a professor on campus.

12.     During the defendant's meetings with the Russian intelligence service in December 1996, the defendant and RIS 1 discussed the defendant's ambitions, including his plans for military service. The defendant informed RIS 1 that he was a "son of Russia" and was trying to learn about Russia. RIS 1 tasked the defendant with getting the names of four nuns at a Catholic church that the defendant visited. The defendant subsequently visited the nuns, obtained their names, and provided the names to RIS 1.

13.     During the defendant's meetings with the Russian intelligence service in December 1996, the defendant described his political opinions, which were pro-Russian and anti-American.

14.     During the defendant's meetings with the Russian intelligence service in December 1996, a Russian intelligence agent also asked the defendant what he told his ROTC unit about his connections to Russia. The defendant answered that he was being very discrete. A Russian intelligence agent instructed the defendant not to disclose his interactions with the Russian intelligence service.

15.     The defendant returned to the United States from Russia in early 1997. The defendant graduated from the University of Minnesota in September 1997, and received a reserve commission in the U.S. Army.

16.     After graduating from the University of Minnesota, the defendant returned to Russia in September 1997.

17.     In October 1997, the defendant met with agents of the Russian intelligence service, including RIS 1, at an office on a Russian military base in Chelyabinsk.   During the meeting, the Russian intelligence agents gave the defendant a code name, "Ikar Lesnikov."   The defendant wrote a statement stating that he wanted to "serve Russia" and signed the statement with his code name.   One of the Russian intelligence agents (hereinafter, "RIS 2") encouraged the defendant to visit him in Samara before the defendant returned to the United States.

18.     After the meeting in October 1997, the defendant worked in Russia until he was called to start his active duty service in the U.S. Army in July 1998.

19.     Before leaving Russia, the defendant contacted RIS 2 and informed him about his plans to return to the United States.   RIS 2 again urged the defendant to visit him in Samara before departing.   The defendant agreed and met RIS 2 at a train station in Samara.   RIS 2 introduced the defendant to another agent with the Russian intelligence service (hereinafter, "RIS 3").

20.     RIS 3 entertained the defendant for several days in the Volga region of Russia, including at a countryside resort in the area.   During this time, RIS 3 encouraged the defendant to serve well in the U.S. Army.

21.     Before the defendant departed for the United States, the Russian intelligence service provided him a telephone number to use to contact it and instructed the defendant to use his code name if he did.   The defendant told the Russian intelligence service that he would return to Russia when he was on leave.

22.     In June 1998, the defendant returned to the United States.   The following month, in July 1998, the defendant began active duty service in the U.S. Army.

23.     In or around December 1998, the defendant deployed to the Republic of Korea (hereinafter, "South Korea") as a Lieutenant in the 4th Chemical Company.

24.     The defendant returned to Russia in June 1999 when he was on leave during his tour in South Korea.   The first week he was in Russia, the defendant called RIS 2 and informed him that he was in Chelyabinsk.

25.     The defendant subsequently met with RIS 2 in Chelyabinsk.   During the meeting, the defendant asked RIS 2 which agency he worked for, and RIS 2 answered that he worked for the GRU.[2]   Until that point, the defendant had assumed he was meeting with agents of the FSB.[3] From that point forward, the defendant understood that he was meeting with agents of the GRU.

26.     During the meeting, RIS 2 asked the defendant for information about his unit in South Korea.   The defendant provided information to RIS 2 about, among other things, the number of men in his platoon, the unit's assigned equipment, and the unit's mission.

27.     During the meeting, the defendant told RIS 2 that he wanted to leave the U.S. Army. RIS 2, however, encouraged the defendant to remain in the military.

28.     At one point during the meeting, RIS 2 questioned whether the defendant was actually a spy for a U.S. intelligence agency.   The defendant denied the accusation, insisting that he loved and was committed to Russia.   RIS 2 asked the defendant whether he would be willing to submit to a polygraph, and the defendant agreed.   RIS 2 did not ultimately give him a polygraph.   RIS 2 also asked whether the defendant would agree to employ electronic equipment

---

[2] The Main Intelligence Directorate of the General Staff, commonly known as the "GRU," is Russia's primary military intelligence agency and provides strategic intelligence to support the Russian military.

[3] The Federal Security Service, or "FSB," is Russia's primary domestic intelligence and security service.

for the Russian intelligence service, and the defendant agreed.   Again, RIS 2 did not follow up on the request.

29.      During the meeting, RIS 2 provided the defendant with an address in Samara and told him to send a postcard as an emergency signal if he needed to make contact with the Russian intelligence service.   RIS 2 instructed the defendant to use his code name on the postcard and a cover greeting like "Happy Victory Day" or "Happy Mother's Day."

30.      During this time, the defendant sought to help Russia, as he considered himself pro-Russian and a loyal son of Russia.   The defendant thought that the United States was too dominant in the world and needed to be cut down to size.

31.      In or around December 1999, the defendant completed his tour in South Korea. The defendant then served as a Lieutenant with the 7th Chemical Company at Fort Polk, Louisiana, until in or around April 2001.

32.      The defendant returned to Russia around July 2000.   After he arrived, an agent with the Russian intelligence service, "RIS 4," called the defendant in Moscow and introduced himself as RIS 2's friend.   RIS 4 informed the defendant that RIS 2 sent his greetings but had accepted another job.   RIS 4 was also from Samara but agreed to meet with the defendant in Moscow.   The defendant met with RIS 4 at least twice.

33.      During the meetings, the defendant informed RIS 4 that he was joining the U.S. Army Special Forces.   RIS 4 encouraged the defendant to pursue the Special Forces.   RIS 4 told the defendant he was of no use to the Russian intelligence service as an infantry commander.

34.      During the meetings, RIS 4 asked the defendant for information about the defendant's unit at Fort Polk.   The defendant provided RIS 4 with information about the unit's assigned equipment and mission.

35.     During the meetings, RIS 4 also paid the defendant $1,000 as gratitude for his assistance to the Russian intelligence service.   Initially, the defendant declined the payment, stating he had true love for Russia.   However, the defendant ultimately accepted the money and signed for it using his code name.

36.     At or around the time he was stationed at Fort Polk, the defendant was selected for the U.S. Army Special Forces.   In June 2003, after completion of his training, the defendant was assigned as a Captain to the 1st Battalion, 10th Special Forces Group stationed in Germany.

37.     The defendant traveled to Russia again in August 2003.   After arriving, the defendant called a telephone number that the Russian intelligence service previously provided him. The defendant arranged a meeting with the Russian intelligence service at a hotel in Chelyabinsk. There, the defendant met with two agents of the Russian intelligence service whom he had not previously met (hereinafter, "RIS 5" and "RIS 6").

38.     During the meeting, RIS 5 and RIS 6 asked the defendant about his unit, the 1st Battalion, 10th Special Forces Group.   The defendant provided information about the number of companies and men in the unit, and their location and role.

39.     During the meeting, RIS 5 and RIS 6 instructed the defendant not to take a polygraph and offered to give him training on how to deceive polygraphs.   They further encouraged the defendant to continue pursuing a career in the Special Forces.

40.     During the meeting, RIS 5 and RIS 6 gave the defendant a bottle of Cognac and a Russian military uniform as a gift.

41.     At some point, RIS 5 informed the defendant that he was associated with the GRU.

42.     Thereafter, in August 2004, the defendant was granted a TOP SECRET security clearance, with SCI access.

43.     Around that time, the defendant deployed to the Republic of Azerbaijan with his Special Forces unit.   The defendant's unit was responsible for operations in both Azerbaijan and the Republic of Georgia.   During this deployment, the defendant was investigated for a security violation and removed from his command in Azerbaijan.   The defendant's security clearance was subsequently suspended in late 2004 or early 2005, around or soon after the time he was removed from his command in Azerbaijan.

44.     The defendant was honorably discharged from active duty in the U.S. Army in November 2005.   After his discharge from active duty service in the U.S. Army, the defendant lived in Minnesota until 2010, where he worked for a Ukrainian steel manufacturer and a transportation company.   The defendant also served in the U.S. Army inactive reserve from December 2005 until 2010.

45.     The defendant traveled to Russia again from August to September 2008.   After arriving in Russia in August 2008, the defendant met with RIS 5 and another Russian intelligence agent also from Samara (hereinafter, "RIS 7") at least two or three times.   The defendant informed RIS 5 and RIS 7 that he was finished with the U.S. Army and wanted to pursue business opportunities in Russia.

46.     During the meetings in either 2008 or 2010, RIS 7 provided the defendant with the name of his cover company and gave the defendant his contact information.   RIS 7 instructed the defendant to tell his family that he was working with the cover company to explain any calls that he might have with the Russian intelligence service.

47.     During the meetings with RIS 5 and RIS 7 in 2008, the defendant provided them with information about, among other things, his former Special Forces unit's mission and activities in Azerbaijan and Georgia.   This disclosure included national defense information classified at

9

the SECRET//NOFORN level, meaning that the unauthorized disclosure of the information, including to foreign nationals, was prohibited and reasonably could be expected to cause serious damage to U.S. national security. The defendant intended and had reason to believe that this information was to be used to the injury of the United States and to the advantage of Russia.

48.     During the meetings with RIS 5 and RIS 7 in 2008, the defendant also provided them with the names of and information about a number of his former Special Forces team members. The defendant understood that RIS 5 and RIS 7 sought this information for the purpose of evaluating whether to approach the team members to see if they would cooperate with the Russian intelligence service. The defendant identified for RIS 5 and RIS 7 at least one specific Special Forces team member whom he thought they could approach.

49.     The defendant provided information to the Russian intelligence agents in 2008 at least in part because he was angry and bitter about his time in the U.S. Army. The defendant also thought that Russia needed to be built up and that America needed to be "cut down to size." The defendant further provided this information because he wanted to obtain the Russian intelligence service's assistance in doing business in Russia.

50.     During the meetings in 2008, RIS 5 asked the defendant whether he had any U.S. military field manuals. After the defendant confirmed that he did, RIS 5 tasked the defendant with scanning the field manuals, putting them on a flash drive, and bringing the flash drive to their next meeting.

51.     The defendant returned to the United States from Russia in September 2008.

52.     The following month, in October 2008, the defendant submitted a "Questionnaire for National Security Positions (Standard Form-86)," commonly known as an "SF-86," in connection with a background investigation for a security clearance. The SF-86 included a

question that required him to disclose any contacts he ever had with a foreign government, an establishment of a foreign government, or representatives of a foreign government. The defendant did not disclose his contacts with the Russian intelligence service or any of its agents in response to the question (or any other question).

53.     Beginning in April 2009, the defendant and RIS 7 began exchanging a series of emails that, on their face, referenced potential business opportunities. In an April 2009 email, RIS 7 encouraged the defendant to travel to Russia for a visit, but the defendant did not commit to the trip. Later, in August 2009, RIS 7 sent an email to the defendant inviting the defendant to travel to Russia and offering to pay his expenses. The defendant, however, did not travel at that time.

54.     In January 2010, an Adjudicator with the U.S. Army Central Personnel Security Clearance Facility sent the defendant a letter notifying him that he had been granted a TS/SCI security clearance. The letter, however, noted concerns about the defendant's business connections and father-in-law, and his prior relief of command in Azerbaijan. The letter cautioned the defendant that "[s]ituations such as those . . . have been exploited in the past by the intelligence services of foreign countries." The letter warned that "[e]xtensive association with foreign nationals increases the opportunities for [him] to be the target of a foreign intelligence service and, therefore, should be avoided." The letter emphasized the defendant's "responsibilities for reporting any possible contact by representatives or citizens of foreign countries."

55.     In August 2010, the defendant sent an email to RIS 7 to inform him that he planned to travel to Russia in September 2010. The defendant asked to meet with RIS 7 to discuss a

business matter.  The defendant and RIS 7 subsequently exchanged a series of emails regarding the defendant's travel plans and arranging a meeting in Chelyabinsk.

56.     On September 8, 2010, the defendant arrived in Russia.  Three days later, on September 11, 2010, the defendant emailed RIS 7, informing him that he was in Chelyabinsk and would remain there until September 22.

57.     While in Russia in September 2010, the defendant met RIS 5 and RIS 7 at least three times.  During these meetings, the defendant reemphasized that he wanted to pursue business opportunities in Russia.  RIS 5 and RIS 7 agreed to try to help him.  RIS 5, however, encouraged the defendant to seek employment with the U.S. Government.

58.     During the meetings, RIS 5 and RIS 7 asked whether the defendant brought the field manuals that RIS 5 had previously requested.  The defendant explained that he did not bring the field manuals because he was scared the U.S. Department of Homeland Security would have stopped him at the airport and seized his electronic devices.

59.     During the last meeting, RIS 7 introduced the defendant to a Russian national who, according to the defendant, was involved in finding investors for an infrastructure project (hereinafter, "RUSSIAN NATIONAL").  The defendant understood the RUSSIAN NATIONAL to be a businessman connected to the Russian intelligence service.  According to the defendant, RIS 7 and the RUSSIAN NATIONAL asked the defendant to find U.S. investors for the infrastructure project.

60.     From September 2010 until at least January 2011, the defendant and the RUSSIAN NATIONAL exchanged emails, many of which referenced the infrastructure project and/or other business projects.

12

61.     On November 5, 2010, the RUSSIAN NATIONAL emailed the defendant, stating that he had not heard from the defendant in a long time.  The RUSSIAN NATIONAL specifically told the defendant that "Ivan," the first name of RIS 7, sent his greetings.

62.     Three days later, on November 8, 2010, the defendant responded to the RUSSIAN NATIONAL and informed him that he was about to move to "the capital," meaning Washington, D.C.

63.     On January 3, 2011, the defendant sent the RUSSIAN NATIONAL an email stating that he had moved to "the capital," meaning Washington, D.C., and that he was working on their business matter.

64.     In addition, after returning from Russia in September 2010, the defendant contacted individuals in the United States about the infrastructure project—including a former Special Forces team member in October 2010—and held himself out as the U.S. contact for the project and the RUSSIAN NATIONAL as the Project Manager.

65.     During the period between December 1996 and January 2011, the defendant failed to report his contacts with the Russian intelligence service to the U.S. Government, even when he was required to do so.

66.     For example, the defendant submitted an SF-86 to the U.S. Government in April 2003 as part of a background investigation.  The SF-86 included a question that required him to disclose his contacts with any foreign government, establishment of a foreign government, or representatives of a foreign government.  The defendant did not disclose his contacts with the Russian intelligence service or any of its agents in the SF-86.

67.     As described in paragraph 52, the defendant also failed to disclose his contacts with the Russian intelligence service when required to do so on the SF-86 that he submitted in October 2008.

68.     Moreover, after his travel to Russia in 2000 and 2003, the defendant was interviewed about his travel by military S-2 officers—officers responsible for information security in a U.S. Army unit and interviewing individuals following individual travel to identify potential security threats.   During his interviews with the S-2 officers, the defendant did not disclose his contacts with the Russian intelligence agents, even when asked about his contacts there.

69.     This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States.   It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

70.     The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Date:   November 18, 2020          By:

Thomas W. Traxler
James L. Trump
Assistant United States Attorneys

David Aaron
Trial Attorney, U.S. Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, PETER RAFAEL DZIBINSKI DEBBINS, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
PETER RAFAEL DZIBINSKI DEBBINS

I am the attorney for the defendant, PETER RAFAEL DZIBINSKI DEBBINS.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Rammy G. Barbari, Esq.
Attorney for PETER RAFAEL DZIBINSKI DEBBINS