IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETER RAFAEL DZIBINSKI | ) | Case No. 1:20-cr-193-CMH |
| DEBBINS, | ) | |
| a/k/a "Ikar Lesnikov," | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S POSITION ON SENTENCING

*"There is no greater betrayal than the betrayal of one's country and brothers and sisters in arms."* **– Major General John W. Brennan (Ex. G)**

The defendant, Peter Rafael Dzibinski Debbins, has pleaded guilty to participating in an espionage conspiracy with Russian intelligence agents from December 1996 to January 2011. Debbins's *fourteen-year* participation in the conspiracy encompassed his entire service as a U.S. Army officer, including as a Captain in the elite U.S. Army Special Forces. In furtherance of the conspiracy, Debbins provided the Russian intelligence agents with, among other things, classified, national defense information about one of his Special Forces deployments—a disclosure that threatened serious damage to U.S. national security. And, in a particularly personal betrayal, Debbins provided information about several of his former Special Forces team members for the Russian intelligence agents to use in deciding whether to try to recruit them. Debbins, who has family ties to Russia, committed the offense for primarily ideological reasons: he considered himself a "loyal son" of Russia and believed that America needed to be "cut down to size."

To make matters worse, Debbins lied about and concealed his contacts with the Russian intelligence agents for nearly a quarter of a century, even after the alleged conspiracy.  By deliberately concealing the contacts during background investigations (when he had a legal obligation to report them), Debbins was able to obtain employment in sensitive positions in the U.S. intelligence community, with access to highly classified information, from April 2011 until July 2019.  Debbins, a serious security vulnerability considering his history of espionage activity, put national security further at risk by lying and deceiving his way into those positions.  Debbins did not reveal his contacts with the Russian intelligence agents to law enforcement until after he failed a polygraph as part of a security clearance reinvestigation in early July 2019.

As just punishment for the offense, the Government recommends that the Court sentence Debbins to seventeen years of imprisonment.  This sentence is on the lower side of the range that the Sentencing Guidelines advise, accounting for Debbins's early acceptance of responsibility.  At the same time, a seventeen-year sentence reflects the seriousness of the offense, which involved the commission of one of this nation's most serious federal crimes (conspiracy to commit espionage) for an extraordinary fourteen years and the disclosure of information that jeopardized U.S. national security and the safety and well-being of individual servicemembers.  A seventeen-year sentence also avoids unwarranted sentencing disparities, as it is consistent with the sentences imposed or stipulated to in recent espionage cases.  Finally, a seventeen-year sentence would send a clear deterrent message to other servicemembers contemplating whether to betray this country that such offenses will warrant substantial jail time.

## BACKGROUND

Debbins was born in Minnesota in January 1975.  *See* Statement of Facts ¶ 6 (Nov. 18, 2020) (Dkt. No. 35) (hereinafter, "SOF").  His mother was originally from the former Soviet

Union, and due to her heritage, he became interested in Russia at an early age.  *See id.*  In 1994, at the age of 19, Debbins traveled to Russia for the first time.  *See id.* ¶ 7.  Around that time or soon thereafter, Debbins met his current wife in Chelyabinsk, a city in Russia that is the home of a Russian air force base.  *See id.*  Debbins's father-in-law was a Colonel in the Russian air force.  *See* Ex. A, ¶ 32.  Debbins and his wife married in Chelyabinsk in November 1997.  *See id.* ¶ 31.

### A.    Debbins's Conspiracy with Russian Intelligence Agents

As described below, Debbins has admitted that he participated in an espionage conspiracy with Russian intelligence agents from December 1996 until January 2011.  *See* SOF ¶ 1.  According to Debbins, when visiting Russia during that period, he met with agents of the Main Intelligence Directorate of the General Staff, commonly known as the "GRU," Russia's primary military intelligence agency.  *See* Declaration of Special Agent Patrick M. Lueckenhoff, Ex. 1 (Aug. 27, 2020) (Dkt. No. 21-1) (hereinafter, "Lueckenhoff Decl."); SOF ¶ 25 & n.2.

### 1.    Russian intelligence agents contact and begin meeting with Debbins in 1996.

In August 1996, Debbins traveled to Russia as part of an independent study program.  *See* SOF ¶ 9; Ex. A, ¶¶ 26-28.  At the time, Debbins was a student at the University of Minnesota, where he was a member of the Reserve Officers' Training Corps (ROTC).  *See* SOF ¶¶ 8-9.  Debbins held a SECRET level security clearance from the U.S. Government.  *See id.* ¶ 8.  While in Russia in 1996, Debbins lived in Chelyabinsk.  *See id.* ¶ 9.

Approximately four months after Debbins arrived, in December 1996, a Russian intelligence agent reached out to him to arrange a meeting.  *See id.* ¶ 10.  They subsequently met at an office on the military base in Chelyabinsk, *see* Ex. A, ¶ 29, where they discussed Debbins's participation in ROTC and his plans for military service, *see* SOF ¶ 10.  The Russian intelligence agent then introduced Debbins to another Russian intelligence agent (RIS 1), who was from Samara, a city in the Volga region of Russia.  *See id.* ¶ 11; Ex. A, ¶ 29.

Debbins had two additional meetings with Russian intelligence agents, including RIS 1, in December 1996.  *See* SOF ¶ 11.  At these initial meetings, Debbins demonstrated his ideological allegiance to Russia.  He told RIS 1 that he considered himself a "son of Russia."  *Id.* ¶ 12.  Debbins also discussed his political opinions, which were pro-Russian and anti-American (despite training to be a U.S. Army officer at the time).  *See id.* ¶ 13.  The attached photograph of Debbins in a Russian military uniform, the back of which suggests the photograph was taken in 1994 or 1997, illustrates his pro-Russian disposition.  Ex. B; *see also* Ex. A, ¶ 35.

During these meetings, Debbins also proved that he was willing to betray others— specifically, Americans—in service of the Russian intelligence agents.  At the second meeting, RIS 1 asked Debbins to obtain the names of four American nuns at a Catholic church that Debbins attended.  *See* SOF ¶ 12; Lueckenhoff Decl. Ex. 1, at 1.  RIS 1 told Debbins that he sought the names because of concerns of cult activity.  *See* Ex. A, ¶ 30.  Debbins visited the nuns, obtained their names, and provided them to RIS 1.  *See* SOF ¶ 12.

At the meetings, Debbins also showed a willingness to engage in deceit to conceal his relationship with the Russian intelligence agents.  The Russian intelligence agents gave Debbins a cover story—that he was meeting with a professor on campus—to tell his girlfriend when he was meeting with them.  *See id.* ¶ 11.  The Russian intelligence agents also inquired as to what Debbins told his ROTC unit about his connections to Russia.  *See id.* ¶ 14.  Debbins assured them that he was being very discrete.  *See id.*  The Russian intelligence agents instructed Debbins not to disclose his interactions with them, *see id.*, an admonition that Debbins followed for the next two decades, *see infra* pp. 14-15.

## 2.    Debbins lives in Russia, where the Russian intelligence agents continue to groom him, from September 1997 to June 1998.

In early 1997, Debbins returned to the United States.  *See* SOF ¶ 15.  That September, he

4

graduated from the University of Minnesota and received a reserve commission in the U.S. Army.  *See id.*  As a Reserve Commissioned Officer, Debbins took an Oath of Office in which he swore to "support and defend the Constitution of the United States against all enemies, foreign and domestic," and to "bear true faith and allegiance to the same."  Ex. C.  This Oath, however, soon proved to be an empty promise.

In September 1997, after his graduation, Debbins returned to Russia.  *See* SOF ¶ 16.  The following month, he met with Russian intelligence agents, including RIS 1 and another Russian intelligence agent from Samara (RIS 2) on the military base in Chelyabinsk.  *See id.* ¶ 17.  At that meeting, the Russian intelligence agents gave Debbins the code name "Ikar Lesnikov."  *Id.* Using his code name, Debbins wrote a statement for the Russian intelligence agents in which he attested that he wanted to "serve Russia."  *Id.*

Debbins worked in Russia until he was called to start active-duty service in the U.S. Army in July 1998.  *See id.* ¶ 18.  Before returning to the United States, he contacted RIS 2, who invited Debbins to visit him in Samara.  *See id.* ¶ 19.  In Samara, RIS 2 introduced Debbins to another Russian intelligence agent (RIS 3).  *See id.*  RIS 3 then entertained Debbins for several days in the Volga region, including at a countryside resort.  *See id.* ¶ 20.  During this time, Debbins assured the Russian intelligence agents that he would return to Russia when on leave. *See id.* ¶ 21.  He then traveled back to the United States in June 1998 and started his active-duty service with the U.S. Army in July 1998.  *See id.* ¶ 21.

### 3. Debbins begins providing information about his military units in 1999.

Around December 1998, Debbins, at the time a Lieutenant, deployed to the Republic of Korea (South Korea) as a platoon commander in the 4th Chemical Company.  *See* SOF ¶ 23; Decl. of Defense Intelligence Senior Leader Joseph E. Simon ¶ 6 (Aug. 27, 2020) (Dkt. No. 21-2) (hereinafter, "Simon Decl.").  During his mid-tour leave in June 1999, Debbins traveled to

Chelyabinsk, where he contacted RIS 2 and arranged a meeting. *See* SOF ¶¶ 24-25. At the meeting, Debbins provided RIS 2 with information about his unit in South Korea, including "the number of men in his platoon, the unit's assigned equipment, and the unit's mission." *Id.* ¶ 26.

Debbins has identified this meeting as the moment he learned that the Russian intelligence agents worked specifically for the GRU. Until this point, Debbins assumed he had been meeting with agents of the Federal Security Service, commonly known as the "FSB," Russia's primary domestic intelligence and security service. *See id.* ¶ 25 & n.3. But when Debbins asked RIS 2 which agency he worked for, RIS 2 stated that he worked for the GRU. *See id.* ¶ 25. Debbins thereafter understood that he was meeting with GRU agents. *See id.*

During this meeting, RIS 2 tested Debbins's loyalty. RIS 2 accused Debbins of being a spy for a U.S. intelligence agency—an accusation that Debbins denied, "insisting that he loved and was committed to Russia." *Id.* ¶ 28. RIS 2 asked Debbins whether he would submit to a polygraph and employ electronic equipment for the Russia intelligence service. *See id.* After Debbins agreed to both requests, RIS 2 did not follow up. *See id.*

Even as an active-duty officer in the U.S. Army, Debbins's ideological allegiance to Russia remained. As Debbins has admitted, he continued to harbor pro-Russian views and sought to help Russia during this time. *See id.* ¶ 30. He still considered himself "a loyal son of Russia." *Id.* Debbins "thought that the United States was too dominant in the world and needed to be cut down to size." *Id.*

### 4. Debbins continues providing information about his military units from 2000 to 2003, including after he joined the Special Forces.

After finishing his tour in South Korea around December 1999, Debbins was assigned to the 7th Chemical Company at Fort Polk, Louisiana. *See* SOF ¶ 31. Debbins served as a

Lieutenant with that unit until around April 2001. *See id.* During that time, he was selected for the elite U.S. Army Special Forces. *See id.* ¶ 36.

In or around July 2000, Debbins traveled again to Russia, where he met twice with another Russian intelligence agent (RIS 4) in Moscow. *See id.* ¶ 32. During these meetings, Debbins provided RIS 4 with information about his unit at Fort Polk, including his "unit's assigned equipment and mission." *Id.* ¶ 34. RIS 4 gave Debbins $1,000 for his help. *See id.* ¶ 35. Debbins initially declined the money, "stating he had true love for Russia." *Id.* But Debbins ultimately accepted the money at RIS 4's insistence. *Id.*; Lueckenhoff Decl. Ex. 1, at 2.

During these meetings, Debbins informed RIS 4 of his plan to join the Special Forces. *See* SOF ¶ 33. RIS 4 encouraged Debbins's plan, telling him that "he was of no use to the Russian intelligence service as an infantry commander." *Id.*

After returning from Russia, Debbins entered training for the Special Forces. *See id.* ¶ 36. As a Special Forces officer, the U.S. Army invested an extensive amount in Debbins's training, including "training that taught him how to operate in a clandestine manner and avoid detection from adversaries." Simon Decl. ¶ 11. In June 2003, Debbins was assigned as a Captain to the 1st Battalion, 10th Special Forces Group, in Germany. *See* SOF ¶ 36.

Two months later, in August 2003, Debbins traveled to Russia again. *See id.* ¶ 37. Upon arriving, he contacted the Russian intelligence service and met with two Russian intelligence agents ("RIS 5" and "RIS 6") at a hotel in Chelyabinsk. *See id.* There, he provided RIS 5 and RIS 6 with information about his Special Forces unit, such as "the number of companies and men in the unit, and their location and role." *Id.* ¶ 38. RIS 5 and RIS 6 gave Debbins a bottle of Cognac and a Russian military uniform. *See id.* ¶ 40. RIS 5 and RIS 6 also instructed him not to take a polygraph and offered training on how to defeat a polygraph. *See id.* ¶ 39.

5.     **Debbins commits a security violation and is relieved of command from his Special Forces deployment to Azerbaijan in 2004, separates from active-duty service in 2005, and begins working in the private sector.**

As a Captain in the Special Forces, Debbins deployed to the Republic of Azerbaijan with his unit in the summer of 2004.  *See* SOF ¶ 43.  In addition to Azerbaijan, Debbins's unit was responsible for operations in the neighboring Republic of Georgia.  *See id.*  Both Azerbaijan and Georgia are in the Caucasus region and border Russia.  Around the time that he deployed to Azerbaijan, Debbins obtained a TOP SECRET security clearance, with Sensitive Compartmented Information access (TS/SCI).  *See id.* ¶ 42.

During his deployment, Debbins committed a security violation by relocating his wife to Azerbaijan and providing her with a U.S. government cell phone.  *See* Simon Decl. ¶ 7.  In late 2004 or early 2005, due to the security violation, Debbins was relieved of his command in Azerbaijan and his security clearance was suspended.  *See* SOF ¶ 43; Simon Decl. ¶ 7.

In November 2005, Debbins was honorably discharged from active-duty service in the U.S. Army.  *See* SOF ¶ 44.  He moved back to Minnesota, where he lived until 2010, working first for a Ukrainian steel manufacturer and then a transportation company.  *See id.*; Ex. A, ¶ 34.  Debbins continued serving in the U.S. Army inactive reserve until 2010.  *See* SOF ¶ 44.

6.     **Debbins provides Russian intelligence agents with classified information and information about individual Special Forces team members in 2008.**

In early August 2008, Russia invaded Georgia, sparking the Russo-Georgian War, with a military campaign that lasted for approximately five days until a ceasefire was reached on August 12, 2008.[1]  The United States condemned the invasion as an act of aggression by Russia.[2]

---

[1] *See* Ariel Cohen & Robert E. Hamilton, *The Russian Military and the Georgia War: Lessons and Implications*, Strategic Studies Institute, June 2011, at iii, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a545578.pdf (last visited Apr. 3, 2021).

[2] *See, e.g.*, Office of the Press Secretary, The White House, President Bush Discusses Situation

The war increased U.S.-Russian tensions in the region, which remain today.[3]

Against this backdrop, Debbins traveled to Russia on or about August 12, 2008.  *See* SOF ¶ 45; Ex. A, ¶ 33.  There, he met with two Russian intelligence agents—RIS 5 and another Russian intelligence agent from Samara (RIS 7).  *See* SOF ¶ 45.  Debbins had two or three meetings with RIS 5 and RIS 7.  *See id.*  According to Debbins, he "informed [them] that he was finished with the U.S. Army and wanted to pursue business opportunities in Russia."  *Id.*

During these meetings, Debbins provided RIS 5 and RIS 7 with national defense information, classified at the SECRET//NOFORN level, about his former Special Forces unit's mission and activities in Azerbaijan and Georgia.  *See id.* ¶ 47.  As Debbins has admitted, he "intended and had reason to believe that this information was to be used to the injury of the United States and to the advantage of Russia."  *Id.*  Through the Classified Information Security Officer (CISO), the Government has filed two classified declarations for the Court's review— one describing the substance of the classified information that Debbins admitted to providing RIS 5 and RIS 7, *see* Ex. D, and the other describing the potential damage that Debbins's unauthorized disclosure of the information could have caused to U.S. national security, *see* Ex. E.

---

in Georgia (Aug. 11, 2008), *available at* https://georgewbush-whitehouse.archives.gov/news/ releases/2008/08/print/20080811-1.html (last visited Apr. 3, 2021) (reflecting President Bush's comments that Russia's invasion of Georgia was "unacceptable," had "substantially damaged Russia's standing in the world," and "jeopardize[d] . . . Russia's relations with the United States and Europe").

[3] *See, e.g.*, Daniel Fried, Assistant Secretary of State for European and Eurasian Affairs, Testimony Before the House Committee on Foreign Affairs: U.S.-Russia Relations in the Aftermath of the Georgia Crisis (Sept. 9, 2008), *available at* https://2001-2009.state.gov/p/eur/ rls/rm/109363.htm (last visited Apr. 3, 2021); U.S. Embassy in Georgia, U.S. Embassy Statement on 12th Anniversary of 2008 Russo-Georgian War (Aug. 7, 2020), *available at* https://ge.usembassy.gov/u-s-embassy-statement-on-12th-anniversary-of-2008-russo-georgian- war/ (last visited Apr. 3, 2021).

In addition to disclosing this classified information, Debbins also provided RIS 5 and RIS 7 with the names of, and other personal information about, approximately six of his former Special Forces team members. *See* SOF ¶ 48; Ex. A, ¶ 4. The attached declaration, filed under seal, describes some of the information that Debbins admitted to providing about his former team members. *See* Ex. A, ¶¶ 4-8. Debbins has admitted that he "understood that RIS 5 and RIS 7 sought this information for the purpose of evaluating whether to approach the team members to see if they would cooperate with the Russian intelligence service." SOF ¶ 48. Debbins, in fact, advised RIS 5 and RIS 7 of "at least one specific . . . team member whom he thought they could approach." *Id.*; *see also* Ex. A, ¶ 5 (describing team member).

Further, in the 2008 meetings with RIS 5 and RIS 7, Debbins disclosed the identity of an intelligence officer with whom he interacted while in the Special Forces. *See* Ex. D.

Debbins has admitted his motivations in providing this information in 2008. Part of his motivation remained ideological: he "thought that Russia needed to be built up and that America needed to be 'cut down to size.'" SOF ¶ 49. Part of his motivation was to exact revenge: he "was angry and bitter about his time in the U.S. Army." *Id.* And part of his motivation was to curry favor for pecuniary gain: he "wanted to obtain the Russian intelligence service's assistance in doing business in Russia." *Id.*

### 7.     Debbins communicates over email with one of the Russian intelligence agents while seeking a security clearance from 2009 to 2010.

In September 2008, Debbins returned to the United States from Russia. *See* SOF ¶ 51. The next month, he submitted a "Questionnaire for National Security Positions (Standard Form-86)," also known simply as an "SF-86," to the U.S. Government as part of a background investigation for a security clearance. *Id.* ¶ 52. Debbins was still eligible for a security clearance in connection with his service in the inactive reserve. *See* Simon Decl. ¶ 9. On his SF-86,

Debbins failed to disclose any of his contacts with the Russian intelligence agents, even though the SF-86 contained questions that required him to disclose such contacts that he had with a foreign government.  *See* SOF ¶ 52.

While his investigation for a security clearance was pending, Debbins exchanged emails with RIS 7.  *See id.* ¶ 53.  The emails discussed (at least facially) potential business opportunities.  *See id.*  But they also reflect that RIS 7 encouraged Debbins to travel to Russia twice in 2009, first in April 2009 and then again in August 2009, even offering to pay his expenses for the latter trip.  *See id.*  Debbins did not travel to Russia during that time.  *See id.*

In January 2010, the U.S. Army notified Debbins via letter that he had been granted a TS/SCI security clearance.  *Id.* ¶ 54.  The letter, however, noted concerns about his business connections and father-in-law, and his prior relief of command in Azerbaijan.  *Id.*  It cautioned that a foreign intelligence service could exploit such situations and emphasized his "responsibilities for reporting any possible contact by representatives or citizens of foreign countries."  *Id.*

Despite these warnings, Debbins emailed RIS 7 in August 2010 to inform RIS 7 that he planned to travel to Russia in September 2010.  *See id.* ¶ 55.  Debbins "asked to meet with RIS 7 to discuss a business matter."  *Id.*  Over email, they arranged to meet in Chelyabinsk.  *Id.*

### 8.   Debbins begins applying to the U.S. intelligence community after meeting with Russian intelligence agents in 2010.

In early September 2010, Debbins traveled to Russia and stayed for approximately two weeks.   *See* SOF ¶ 56.  During that time, he met with RIS 5 and RIS 7 at least three times in Chelyabinsk.  *See id.* ¶¶ 56-57.  In these meetings, Debbins "reemphasized that he wanted to pursue business opportunities in Russia."  *Id.* ¶ 57.  While RIS 5 and RIS 7 agreed to help him, RIS 5 encouraged Debbins to pursue employment in the U.S. Government.  *See id.*

At the last meeting, RIS 7 introduced Debbins to another Russian national, whom Debbins understood to be "a businessman connected to the Russian intelligence service" (hereinafter, the "Russian National").  *See id.* ¶ 59.  According to Debbins, the Russian National was seeking to find investors for an infrastructure project in Russia, and RIS 7 and the Russian National asked him to find U.S. investors.  *See id.*

During this time, Debbins knew that RIS 7 used business affiliations as a cover for Russian intelligence activities.  In either the 2008 or 2010 meetings, "RIS 7 provided [Debbins] with the name of his cover company and gave [Debbins] his contact information."  *Id.* ¶ 46.  "RIS 7 instructed [Debbins] to tell his family that he was working with the cover company to explain any calls that he might have with the Russian intelligence service."  *Id.*

After Debbins returned to the United States from Russia in September 2010, he began exchanging a series of emails with the Russian National.  *See id.* ¶ 60.  Many of the emails referenced, at least on their face, the infrastructure project or other business projects.[4]  *See id.*

Through these emails, Debbins kept the Russian National apprised of his efforts to move from Minnesota to the Washington, D.C. area.  In early November 2010, the Russian National emailed Debbins and stated that he had not heard from him in a long time.  *See id.* ¶ 61.  The Russian National specifically noted that "Ivan"—the first name of RIS 7—sent his greetings, *see id.*, an apparent effort to prompt a response from Debbins.  Sure enough, Debbins responded to the Russian National three days later, noting that he was about to move to "the capital."  *See id.* ¶ 62.  Then, on January 3, 2011, Debbins emailed the Russian National, informing him that he had moved to "the capital" and that he was working on their business matter.  *See id.* ¶ 63.

---

[4] During this period, Debbins emailed U.S. persons information about the infrastructure project. *See* SOF ¶ 64.  Debbins, however, claims that he ultimately told the Russian National that he did not find investors.  *See* Lueckenhoff Decl. Ex. 1, at 3.

During this time, Debbins moved from Minnesota to Northern Virginia and began applying for positions in the U.S. intelligence community.  He moved first to Virginia Beach in December 2010 and then to Manassas in January 2011.  *See* Ex. A, ¶ 34.  On or about December 17, 2010, Debbins applied for four positions at the Central Intelligence Agency (CIA).  *See id.* ¶¶ 9-10(a).  The following month, Debbins applied for seventeen positions at the National Security Agency.  *See id.* ¶ 11.  Debbins did not obtain any of these positions.  *See id.* ¶ 10-11.

### B.   Post-2010 Employment with the U.S. Intelligence Community

Debbins ultimately secured a position with an intelligence branch of the U.S. Army.  In around April 2011, Debbins began working for Mission Essential Personnel as a contractor "in support of a sensitive cyber platform for Army Counterintelligence at the 902nd Military Intelligence Group."  Simon Decl. ¶ 12.  In that role, Debbins "supported a mission to conduct counterintelligence activities in cyberspace . . . up to and including Top Secret activities."  *Id.* ¶ 13.  His work included "utiliz[ing] his Russian language capability and address[ing] the Russian threat to the U.S. Army."  *Id.*  Through his work, Debbins had access to highly classified information.  *See id.* ¶¶ 13-15.

Then, from 2014 to 2019, Debbins obtained a series of positions with contractors for the Defense Intelligence Agency (DIA).  *See* Decl. of David L. Tomlinson ¶¶ 4-7 (Aug. 27, 2020) (Dkt. No. 21-3) (hereinafter, "Tomlinson Decl.").  In those positions, Debbins continued to have access to highly classified information that, if disclosed without authorization, would be "reasonably likely" to cause "exceptionally grave damage to the national security of the United States."  *Id.* ¶ 9.

Throughout this period from 2011 to 2019, Debbins also applied unsuccessfully for numerous other positions in the U.S. intelligence community.  As detailed in the attached declaration, he unsuccessfully applied for positions at the CIA and DIA.  *See* Ex. A, ¶¶ 10, 12.

In 2015, he applied to be a Special Agent at the FBI but later withdrew his name from consideration.  *See id.* ¶ 13.  After the 2016 presidential election, Debbins even applied to the White House, seeking to obtain a position on the National Security Council.  *See id.* ¶ 14.

### C.    Debbins's Concealment of Contacts with Russian Intelligence Agents

As Debbins has admitted, he concealed his relationship and contacts with the Russian intelligence agents until July 2019, *see* Ex. A, ¶ 15, including when he was applying to work in the U.S. intelligence community.  Debbins has justified not disclosing the contacts by stating that he was concerned "it would have destroyed [his] military career and left a black mark on [his] permanent record."  Lueckenhoff Decl. Ex. 1, at 4.

From 1996 to 2010, Debbins failed to disclose his contacts with the Russian intelligence agents as required on multiple occasions.  *See* SOF ¶ 65.  He failed to disclose his contacts with the Russian intelligence agents on an SF-86 that he submitted to the U.S. Government in April 2003, even though he was required to do so.  *See id.* ¶ 66.  He likewise concealed his contacts with the Russian intelligence agents when completing the SF-86 that he submitted in October 2008.  *See id.* ¶ 67.  And, in 2000 and 2003, after returning from his trips to Russia, he failed to disclose his contacts with the Russian intelligence agents when interviewed by military S-2 officers—officers responsible for information security in a U.S. Army unit—even when asked about his contacts in Russia.  *See id.* ¶ 68.

Even after 2010, Debbins continued lying and concealing his contacts with the Russian intelligence agents while applying for positions in the U.S. intelligence community.  *See* Ex. A, ¶¶ 15-21.  For example, Debbins failed to disclose his contacts with the Russian intelligence agents, as required, on SF-86s that he submitted in 2011 and 2014 in connection with his work for contractors of Army Counterintelligence and the DIA, respectively.  *See id.* ¶¶ 16-17, 20-21. Likewise, in September 2013, Debbins lied during a pre-employment interview with a DIA

investigator by stating that he had never had any contact with a representative from a foreign intelligence service. *See id.* ¶ 19. As these examples illustrate, Debbins concealed his espionage activities to obtain employment with the U.S. intelligence community.

### D.   Procedural History

As of July 2019, Debbins was working for a DIA contractor overseas. *See* Tomlinson Decl. ¶ 7; Ex. A, ¶ 22. That month, as part of his security clearance reinvestigation, he returned to the United States to take a polygraph examination, which he failed.[5] *See* Ex. A, ¶ 23. After Debbins failed the polygraph, he participated in a series of voluntary interviews with FBI agents from July 2019 to December 2019. *See id.* ¶ 24. During these interviews, Debbins detailed his cooperation with the Russian intelligence agents from 1996 until 2010. *See id.* Debbins has claimed that his conspiracy with the Russian intelligence agents did not continue past January 2011. *See id.* ¶ 25; SOF ¶ 1.

On August 20, 2020, the grand jury returned a single-count indictment charging Debbins with conspiracy to gather or deliver defense information to aid a foreign government, in violation of Title 18, U.S. Code, § 794(a) & (c). *See* Indictment (Aug. 20, 2020) (Dkt. No. 1). The FBI arrested Debbins the following day, on August 21, and he has been detained since that time. On November 18, 2020, Debbins pleaded guilty to the charged espionage conspiracy and entered into a plea agreement with the Government. *See* Plea Agreement (Nov. 18, 2020) (Dkt. No. 34).

### DISCUSSION

The espionage conspiracy offense to which Debbins has pleaded guilty carries a maximum term of life imprisonment. *See* 18 U.S.C. § 794(a), (c). The offense also carries a

---

[5] The government includes the information that Debbins failed his polygraph examination solely to provide the context leading to the FBI interviews—not as a factor to be considered in determining Debbins's sentence.

maximum fine of $250,000, *see id.* § 3571(b)(3), and a maximum term of supervised release of five years, *see id.* § 3583(b)(1). In determining a sentence within the statutory range, the Court must consider the factors set forth in § 3553(a). *See id.* § 3582(a). As explained below, these factors support a term of imprisonment of seventeen years.

**A.    A Term of Imprisonment of Seventeen Years Is Consistent with the Sentencing Guidelines.**

Section 3553(a) requires the Court to consider the Sentencing Guidelines when sentencing a defendant. *See* § 3553(a)(4). Despite their advisory nature, the guidelines remain "the 'starting point' and 'initial benchmark' for sentencing." *United States v. Davis*, 855 F.3d 587, 595 (4th Cir. 2017) (quoting *Beckles v. United States*, 137 S. Ct. 886, 894 (2017)). While the guidelines do not constrain the Court's discretion, they nevertheless guide that "discretion by serving as 'the framework for sentencing.'" *Beckles*, 137 S. Ct. at 894 (quoting *Peugh v. United States*, 569 U.S. 530, 542 (2013)).

Here, the Government agrees with the calculation of Debbins's guidelines range in the Presentence Investigation Report (PSR). Debbins is a criminal history category I. As the PSR reflects, Debbins has a total-offense level of 36, which is calculated as follows:

- As stipulated in the Plea Agreement, Debbins's base-offense level is 37 because the offense involved the transmission of SECRET level information to Russian intelligence agents. *See* U.S.S.G. § 2M3.1(a)(2); Plea Agreement, at 3.

- As further stipulated in the Plea Agreement, a two-level enhancement applies because Debbins abused a position of public trust or used a special skill in a manner that significantly facilitated the commission of the offense. *See* U.S.S.G. § 3B1.3; *United States v. Ford*, 288 F. App'x 54, 61 (4th Cir. 2008); Plea Agreement, at 3.

- The Government agrees that Debbins is entitled to a three-level reduction due to his timely acceptance of responsibility.[6] *See* U.S.S.G. § 3E1.1; Plea Agreement, at 4.

---

[6] Debbins timely notified the Government of his intention to plead guilty, thereby assisting authorities in the prosecution of his own misconduct. Accordingly, if the Court determines that Debbins has accepted responsibility so as to earn the two-level reduction in U.S.S.G. § 3E1.1(a),

Under these circumstances, the Sentencing Guidelines advise a term of imprisonment of 188 to 235 months. *See* U.S.S.G. ch. 5, pt. A. The Government's recommended sentence of seventeen years (204 months) is on the lower side of that range.

**B.     The Other § 3553(a) Factors Support a Sentence of Seventeen Years.**

In addition to the Sentencing Guidelines, the Court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1), (6). The sentence, moreover, should be "sufficient, but not greater than necessary," to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, protect the public from further crimes of the defendant, afford adequate deterrence to criminal conduct, and provide the defendant with necessary training and treatment. *Id.* § 3553(a)(2). As described below, these § 3553(a) factors support a term of imprisonment of seventeen years.

**1.     The nature and circumstances of the offense**

Conspiracy to commit espionage is one of the most serious crimes in the United States Code. *See United States v. Whitworth*, 856 F.2d 1268, 1289 (9th Cir. 1988) ("Espionage is one of this nation's most serious offenses."); Sentencing Hr'g Tr. 42, *United States v. Mallory*, No. 1:17-cr-154 (E.D. Va. May 17, 2019) (Dkt. No. 280) (hereinafter, "Mallory Sentencing Hr'g Tr.") (recognizing that "[f]ew crimes are as serious as" a conspiracy to engage in espionage). As explained below, the nature and circumstances of this espionage offense are particularly serious and warrant a substantial sentence within the guidelines range.

---

the Government moves the Court to adjust his offense level downward by an additional one level pursuant to § 3E1.1(b).

### i.     The extraordinary duration of the conspiracy

A particularly aggravating circumstance of this espionage offense involves the extraordinary duration of the conspiracy.  For fourteen years, Debbins was an active participant in the espionage conspiracy.  His participation in the conspiracy encompassed his entire service in the U.S. Army, including his active-duty service and service in the inactive reserves.  In fact, the evidence reflects that Debbins was all-in on the espionage conspiracy before his military career even began.  He signed a statement attesting that he wanted to "serve Russia" months prior to starting his active-duty service.

This offense did not involve a momentary lapse of judgment.  Throughout the fourteen-year conspiracy, Debbins had ample opportunity to withdraw and seek to mitigate the risks posed by his conduct.  Yet, over the fourteen years, he continually returned to Russia and met with the Russian intelligence agents, sometimes proactively arranging the meetings with them.  And, as demonstrated above, the conspiracy escalated over time, with Debbins providing more information as it progressed.  The duration of Debbins's active participation in the conspiracy underscores his high degree of culpability.

### ii.     The nature of the information that Debbins disclosed

In addition to the duration of the conspiracy, the nature of the information that Debbins disclosed also warrants a substantial sentence in this case.  As described below, Debbins's disclosures jeopardized U.S. national security, threatened the safety and well-being of individual soldiers, and tarnished the reputation of the U.S. Army as a whole.

Debbins has admitted that he disclosed classified, "national defense information"[7] about his former Special Forces unit's mission and activities in Azerbaijan and Georgia.  SOF ¶ 47.  As

---

[7] The phrase "national defense information," as used in the context of espionage offenses, is a term of art.  Information must satisfy three criteria to qualify as national defense information.

discussed above, he provided this information in the immediate wake of the Russo-Georgian War in August 2008, a period of heightened tensions between Russia and the United States. *See supra* pp. 8-9. The information was classified at the SECRET//NOFORN level, which meant that its unauthorized disclosure "reasonably could be expected to cause serious damage to U.S. national security." SOF ¶ 47. The classified declarations explain how Debbins's disclosure of this information jeopardized, and continues to jeopardize, U.S. national security. *See* Ex. D; Ex. E. Debbins, in fact, has admitted that he "intended and had reason to believe that this information was to be used to the injury of the United States and to the advantage of Russia." SOF ¶ 47. Suffice to say, Debbins's purposeful decision to jeopardize U.S. national security in furtherance of this conspiracy warrants a substantial sentence.

In the same meetings in 2008, Debbins also sought to help the Russian intelligence agents identify other U.S. servicemembers for recruitment by disclosing information about his former Special Forces team members. *See id.* ¶ 48. Debbins's disclosure of this information about his former teammates and servicemembers—his fellow brothers in arms—was a personal betrayal that put their safety and well-being at risk. The attached letter from one of the affected team members summarizes it well:

> I feel personally betrayed. My Detachment Commander sold me out to Russia. It sounds crazy, and almost unbelievable. As a result of my association with Debbins, for the rest of my life I will need to stay vigilant for possible threats to my safety. I will always have to consider if it's safe to travel to destinations outside of the United States. I will always fear for the safety of friends and family who could be targeted for their association with me.

---

First, the information must relate to activities of national preparedness, such as military matters, intelligence gathering, or foreign policy. *See Gorin v. United States*, 312 U.S. 19, 28 (1941); *United States v. Rosen*, 445 F. Supp. 2d 602, 620 (E.D. Va. 2006). Second, the information must be closely held by the U.S. Government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988). Third, disclosure of the information must be potentially damaging to the United States or potentially useful to an enemy of the United States. *See Morison*, 844 F.2d at 1071-72.

Ex. F, at 2. Debbins's personal betrayal of his former teammates, and the risks that he created for them, warrant a substantial sentence.

Finally, Debbins's actions have tarnished the U.S. Army. The world has now observed that Russia successfully placed an espionage recruit within the elite U.S. Army Special Forces, a propaganda victory for Russia at the expense of the reputation of the Special Forces. The attached letter from Major General John Brennan, the commander of the 1st Special Forces Command (Airborne), puts it best:

> Mr. Debbins betrayed his oath as an Officer, his Team, and the Special Forces community. By putting his own loyalties first, and providing Russia information about the Special Forces, he risked lives of those he served with and, potentially, future Special Forces Teams. His actions will likely endanger the force for many years to come. Mr. Debbins's actions are a disgrace to the Special Forces Regiment and bring shame to the entire Special Operations community. Conspiring with Russia is a degradation of all the principles we strive to uphold.

Ex. G. As Major General Brennan observes, Debbins's "actions are reprehensible and merit the application of the full weight of the law in sentencing." *Id.*

### iii.    *Debbins's motivations for committing the offense*

A further aggravating circumstance of this offense involves Debbins's motivations for committing espionage. As Debbins admitted, he harbored pro-Russian, anti-American views at his first meeting with the Russian intelligence agents and continued to harbor those views over the course of the conspiracy.[8] *See* SOF ¶¶ 12-13, 30, 49. By his own admission, when he disclosed the information in 2008, he believed that "Russia needed to be built up and that America needed to be 'cut down to size.'" *Id.* ¶ 49. Debbins's true ideological allegiance to Russia during the conspiracy puts his betrayal in stark relief.

---

[8] Debbins has also claimed that he initially engaged with the Russian intelligence agents out of concern for the safety of his wife's family. *See* Lueckenhoff Decl. Ex. 1, at 4. Even if true, that does not justify why he voluntarily returned to Russia and actively participated in the escalating conspiracy for fourteen years.

Moreover, as the conspiracy progressed, Debbins became motivated by additional, even baser reasons for betraying his country.  He has admitted, for example, that when disclosing the information in 2008, "he wanted to obtain the Russian intelligence service's assistance in doing business in Russia."  *Id.*  He also has admitted that he was "angry and bitter about his time in the U.S. Army," *id.*, presumably the fallout from his security violation and relief of command in Azerbaijan.  As these admissions reflect, Debbins willingly jeopardized the security of his country and the safety and well-being of his teammates for monetary gain and to exact revenge—selfish acts of betrayal that warrant a substantial sentence.

### iv.    *Debbins's deceitful conduct in furtherance of the conspiracy*

A final aggravating circumstance of this offense involves Debbins's use of lies and deceit to further the conspiracy.  Throughout the conspiracy, Debbins actively concealed his contacts with the Russian intelligence agents.  *See* SOF ¶ 65.  At the outset, he assured the Russian intelligence agents that he was being very discrete about his Russian connections.  *See id.* ¶ 14.  As the conspiracy progressed, he and the Russian intelligence agents employed measures to evade detection, such as the use of cover stories to mask their interactions.  *See id.* ¶¶ 11, 29, 46.

Debbins also lied to U.S. authorities to conceal the conspiracy.  As noted above, Debbins failed to disclose his contacts with the Russian intelligence agents, as required, on the SF-86s that he submitted in 2003 and 2008 to obtain security clearances.  *See id.* ¶¶ 66-67.  And he engaged in similar deceit when interviewed by military S-2 officers after his trips to Russia in 2000 and 2003.  *See id.* ¶ 68.  Debbins's deceitful conduct in furtherance of the conspiracy weighs in favor of a substantial sentence.

*****

As the above-described circumstances demonstrate, a substantial sentence within the guidelines range is necessary to "reflect the seriousness of the offense, to promote respect for the

law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

### 2.    The history and characteristics of the defendant

In evaluating Debbins's history and characteristics, the Court should consider that nearly his entire adult life has been marked by lies and deceit.  For almost a decade, he lived a double life as a U.S. Army officer and Russian intelligence source—swearing an oath to bear true allegiance to the United States on one hand while signing a statement promising to "serve Russia" on the other.  *See supra* p. 5.  His duplicitous conduct continued even after the alleged conspiracy period.  As explained above, Debbins continued to conceal his contacts with the Russian intelligence agents until July 2019, even when he was legally required to disclose them. *See supra* pp. 14-15.  The result is that Debbins spent almost twenty-three years—from December 1996 to July 2019—concealing his contacts with the Russian intelligence agents.

Of particular concern, Debbins affirmatively lied about his foreign contacts during at least four background investigations that he underwent in connection with his employment with the Army and the U.S. intelligence community.  For example, he failed to disclose his contacts with the Russian intelligence agents, as required, on SF-86s that he submitted in 2003, 2008, 2011, and 2014.  *See supra* p. 14.  Making a material false statement on an SF-86 submitted as part of a U.S. background investigation is a federal offense under Title 18, U.S. Code, § 1001.[9] Here, Debbins was not prosecuted for making these false statements because the five-year statute of limitations for the offenses had expired by the time the Government learned of his contacts with the Russian intelligence agents.  *See* 18 U.S.C. § 3282(a).  Still, in this respect, the Court should consider that the Sentencing Guidelines understate Debbins's criminal history.

Further, even after the alleged conspiracy period, Debbins's false statements during his

---

[9] *See United States v. Delgado*, 798 F. App'x 105, 106-07 (9th Cir. 2020); *United States v. Polos*, 723 F. App'x 64, 66 (2d Cir. 2018); *United States v. Edwards*, 869 F.3d 490, 504 (7th Cir. 2017).

background investigations in 2011 and 2013-2014 had profound implications for U.S. national security. Debbins's false statements allowed him to obtain sensitive positions with Army Counterintelligence and the DIA, which gave him access to highly classified information. *See* Simon Decl. ¶¶ 13-15; Tomlinson Decl. ¶¶ 5-8. As a longtime Russian intelligence source, however, Debbins was a serious security vulnerability. At any given moment, the Russian intelligence agents could have approached him and demanded his renewed cooperation, blackmailing him if necessary. In fact, in his interviews with the FBI, Debbins speculated that the Russian intelligence agents may not have approached him after his last meeting with them in 2010 because they were waiting for the right time to blackmail him. *See* Ex. A, ¶ 25. Despite these obvious risks, Debbins deliberately inserted himself into the U.S. intelligence community, and he concealed and lied about his contacts with the Russian intelligence service to do so. Through these actions, Debbins put U.S. national security at grave risk.

Finally, in assessing Debbins's history and characteristics, the Court should consider that he cooperated with law enforcement starting in July 2019, but the context cautions against assigning too much weight to that cooperation. Debbins did not simply decide to do the right thing and approach law enforcement to make amends for his crime. Instead, Debbins began confessing to law enforcement only after he failed the polygraph in July 2019. With that context in mind, the Government's seventeen-year recommendation—a sentence on the lower side of the guidelines range—reasonably credits his cooperation with law enforcement.

### 3. The need for the sentence to afford adequate deterrence and protect the public from further crimes of the defendant

A substantial sentence within the guidelines range is also necessary to provide general deterrence to other U.S. government insiders considering whether to commit espionage. Debbins's offense, unfortunately, is not an isolated incident. *See infra* pp. 25-28 (providing

examples of sentences in espionage cases).  Last year alone, the U.S. Department of Justice

charged two additional defendants with espionage under § 794.  *See United States v. Alexander*

*Yuk Ching Ma*, No. 1:20-cr-83 (D. Haw.); *United States v. Mariam Taha Thompson*, No. 1:20-cr-

67 (D.D.C.).  And that number includes only the individuals who were charged last year;

espionage is an exceptionally difficult crime to detect and prosecute.  The Court's sentence

should send a clear message that individuals who betray their country by committing espionage

will suffer a substantial sanction, no matter how long they evade justice before being caught.  A

seventeen-year term of imprisonment—a sentence within the guidelines range—will send that

message.  *See* Mallory Sentencing Hr'g Tr. 48 (rejecting defense's recommendation of a ten-year

sentence as "certainly not enough to provide for general deterrence in the public" because "[t]his

is serious stuff . . . and it needs to be communicated to people in the Intelligence Community that

disclosure of this material to a foreign government is going to lead to a very long sentence").

     In addition to general deterrence, a substantial sentence is also necessary to achieve

specific deterrence and protect the public from further crimes by Debbins.  During Debbins's

eight-year tenure in the U.S. intelligence community from April 2011 to July 2019, he gained

access to highly classified information that, if disclosed without authorization, would be

reasonably expected to cause serious or exceptionally grave damage to U.S. national security.

*See* Simon Decl. ¶¶ 13-15; Tomlinson Decl. ¶¶ 5-9.  The risk remains that Debbins could exact

revenge for his prosecution by disclosing more damaging classified information.  Such a

vengeful act would not be unprecedented.  Debbins admitted to disclosing information in 2008 in

part because he was "angry and bitter" about his treatment in the U.S. Army.  SOF ¶ 49.

     This risk is particularly worrisome in light of Debbins's ties to Russia.  As noted, his wife

is a native Russian and his father-in-law is a former Colonel in the Russian air force.  *See supra*

p. 3.  At least as of January 2014, his wife was the registered owner of an apartment in Chelyabinsk.  *See* Lueckenhoff Decl. ¶ 6.  Debbins has lived and worked in Russia in the past, *see* SOF ¶ 18, and he speaks fluent Russian, *see* Lueckenhoff Decl. Ex. 4, at 4.  A substantial sentence is appropriate to deter and preclude Debbins from fleeing to Russia and divulging more classified information from his time in the U.S. intelligence community.

### 4.      The need to avoid unwarranted sentencing disparities

As a final consideration, the Government submits that its seventeen-year recommendation "avoid[s] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  As prior cases reflect, courts have dealt with espionage convictions under § 794 seriously and imposed lengthy terms of imprisonment.  *See, e.g.*, *United States v. Kevin Patrick Mallory*, No. 1:17-cr-154 (E.D. Va. 2019) (Ellis, J.) (20-year sentence); *United States v. Robert Patrick Hoffman, II*, No. 2:12-cr-184 (E.D. Va. 2014) (Doumar, J.) (30-year sentence); *United States v. Brian Patrick Regan*, No. 1:01-CR-405 (E.D. Va. 2003) (Lee, J.) (life sentence).

The Government submits that this case is most analogous to the recent prosecution of Jerry Chun Shing Lee in front of Judge Ellis.  *See United States v. Jerry Chun Shing Lee*, No. 1:18-cr-89 (E.D. Va.).  In May 2019, Lee, a former CIA case officer, pleaded guilty to conspiring to deliver national defense information, classified at the SECRET level, to Chinese intelligence officers, in violation of Title 18, U.S. Code, § 794(a) & (c).  *See* Plea Agreement ¶ 1, *Lee*, No. 1:18-cr-89 (E.D. Va. May 1, 2019) (Dkt. No. 168); Statement of Facts, *Lee*, No. 1:18-cr-89 (E.D. Va. May 1, 2019) (Dkt. No. 169) (hereinafter, "Lee SOF").  Lee's guidelines calculation involved the same base-offense level and abuse-of-trust enhancement.  *See* Gov't's Position with Respect to Sentencing 7-8, *Lee*, No. 1:18-cr-89 (E.D. Va. Nov. 15, 2019) (Dkt. No.

184) (hereinafter, "Lee Gov't Mem."). Lee, however, also received a two-level obstruction enhancement based on lies he told CIA and FBI agents who were investigating his interactions with the Chinese intelligence officers. *See id.* And Lee received only a two-level reduction for acceptance of responsibility. *See id.* As a result, Lee's guidelines range called for 262-327 months of imprisonment. *See* Minute Entry, *Lee*, No. 1:18-cr-89 (E.D. Va. Nov. 22, 2019) (Dkt. No. 186). Judge Ellis sentenced Lee to nineteen years of imprisonment. *See id.*

In at least two respects, the facts of this case are worse than the facts before Judge Ellis when sentencing Lee. First, a critical distinction is that Lee did not admit to providing the Chinese intelligence officers with classified information, only conspiring to do so. *See* Def.'s Mem. in Aid of Sentencing 1-2, 11, *Lee*, No. 1:18-cr-89 (E.D. Va. Nov. 18, 2019) (Dkt. No. 185) (hereinafter, "Lee Def. Mem."). The government argued that the circumstances of his admissions supported an inference that he passed classified information, but the defense disputed those inferences. *See* Lee Gov't Mem. 11; Lee Def. Mem. 1-2, 11. Here, the government does not have to argue such inferences. Debbins has admitted that he provided national defense information, classified at the SECRET//NOFORN level, to the Russian intelligence agents. That undisputed fact alone is an aggravating circumstance that distinguishes Debbins from Lee.

Second, Lee did not start conspiring with the Chinese intelligence officers until after his employment by the CIA. *See* Lee SOF ¶ 1, 4. At sentencing, Lee's attorneys emphasized that he "ha[d] a record of serving this country and the CIA honorably for twenty years." Lee Def. Mem. 2. Debbins cannot reasonably make such a contention here. As shown above, he conspired with the Russian intelligence agents for his entire service in the U.S. Army. Nor can he rely on his service in the intelligence community as a mitigating factor. As described above, he obtained

those positions by lying and concealing his participation in the espionage conspiracy, and by doing so, he inserted himself as a major security vulnerability into the intelligence community.

Lee's guidelines range was higher than the range here primarily because of the two-level obstruction enhancement that he received for lying to the CIA and FBI agents, but that is not a meaningful distinction. As established above, Debbins also lied to conceal his contacts with the Russian intelligence agents. *See supra* pp. 14-15. Debbins avoided the two-level obstruction enhancement because the evidence suggested that his lies were for the purpose of obtaining or maintaining security clearances, not to thwart this investigation. Still, as with Lee, Debbins lied to conceal his participation in the espionage conspiracy.

Nevertheless, the Government has requested that Debbins receive two years less imprisonment than Lee based on a couple of considerations. First, Debbins pleaded guilty within three months of being indicted, before any motions practice. Lee, in contrast, waited to plead guilty on the eve of trial, following extensive litigation and more than a year after his indictment. Debbins should be credited for his prompt acceptance of responsibility. Second, Debbins cooperated with law enforcement during the investigation, even if it came after his failed the polygraph. For these two reasons, the Government believes that a seventeen-year sentence—two years less than the sentence that Lee received—is appropriate in this case.

In addition, the Government's recommended seventeen-year sentence would be consistent with the recent case against Ron Rockwell Hansen in the District of Utah. *See United States v. Ron Rockwell Hansen*, No. 1:18-cr-57 (D. Utah). In that case, Hansen, a former DIA officer, pleaded guilty to *attempt* to gather or deliver defense information, in violation of Title 18, U.S. Code, 794(a). *See* Statement by Def. in Advance of Plea of Guilty ¶ 1, *Hansen*, No. 1:18-cr-57 (D. Utah Mar. 15, 2019) (Dkt. No. 66). As part of his plea, Hansen admitted that

Chinese intelligence agents recruited him in early 2014 and paid him hundreds of thousands of dollars for information that he provided them, including information that he obtained at industry conferences. *See id.* ¶ 11. He further admitted that he solicited national defense information from a DIA intelligence case worker so he could sell it to the Chinese agents. *See id.* The DIA case officer, who was working with the FBI, allowed Hansen to review and take notes on classified documents. *See id.* The FBI arrested Hansen when he attempted to board a flight to China with the notes, which contained national defense information classified SECRET//NOFORN. *See id.* Hansen admitted that he intended to provide the information to the Chinese agents. *See id.* As part of the plea agreement, Hansen and the government stipulated to a binding sentence of fifteen years of imprisonment under Rule 11(c)(1)(C).[10] *See id.* ¶ 12(b).

Debbins's offense warrants a more substantial sentence. The *Hansen* case involved a thwarted *attempt* to communicate national defense information. Here, Debbins actually communicated national defense information to the Russian intelligence agents, and the classified declarations describe how that disclosure jeopardized national security. Debbins also provided other sensitive, even if unclassified, information, including the names of and information about his former Special Forces team members. Further, Debbins participated in the conspiracy largely for ideological reasons, arguably a deeper and worse betrayal than the monetary gain that Hansen sought. And while Hansen collaborated with the Chinese intelligence agents for only a few years, Debbins conspired with the Russian intelligence agents for fourteen years. Finally, Debbins lied and concealed his participation in the conspiracy for more than twenty years.

---

[10] The district court ultimately sentenced Hansen to ten years. *See* Judgment, *Hansen*, No. 1:18-cr-57 (D. Utah) (Sept. 24, 2019) (Dkt. No. 77). If necessary, at the sentencing hearing, the Government is prepared to address the circumstances explaining why Hansen received a ten-year sentence when his Rule 11(c)(1)(C) plea called for fifteen years. For current purposes, however, the Government emphasizes that the fifteen-year stipulation is the appropriate benchmark.

Given these additional aggravating circumstances, the Government's seventeen-year

recommendation—two years higher than the stipulation in *Hansen*—is appropriate.

## CONCLUSION

For the foregoing reasons, the Court should sentence the defendant to a term of

imprisonment of seventeen years.


Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: _____/s/_____

Thomas W. Traxler
James L. Trump
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3746
Facsimile (703) 299-3980
Thomas.traxler@usdoj.gov


_____/s/_____
David Aaron
Trial Attorney, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone (202) 307-5190
Facsimile (202) 532-4251
Email: David.aaron2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of May, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

_____/s/_____
Thomas W. Traxler
Assistant United States Attorney
