**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|                                 |     |                              |
|---------------------------------|-----|------------------------------|
| **UNITED STATES**               | )   |                              |
|                                 | )   |                              |
| **v.**                          | )   | **Criminal No. 1:20-CR-193-CMH** |
|                                 | )   |                              |
| **PETER DEBBINS,**              | )   |                              |
|            **Defendant.**       | )   |                              |
|                                 | )   |                              |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.      INTRODUCTION**

Peter Debbins, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing.  Mr. Debbins comes before this Honorable Court both humbled and contrite following his acceptance of responsibility upon entering a plea of guilty to one count of Conspiracy to Gather or Deliver Defense Information to Aid a Foreign Government, in violation of 18 U.S.C. § 794(a) and (c). *See* Exhibit A.

Mr. Debbins is forty-six (46) years old and was born and raised in Minneapolis, Minnesota. *See* PSR ¶ 109. He is the youngest of seven (7) biological siblings; however, his parents, David and Victoria Debbins officially adopted ten (10) additional children – four from Korea, four from India, and two from the United States, not to mention the countless other children they fostered and sponsored from around the world. *Id*. Mr. Debbins described his childhood as "fantastic," loved being part of such a large family, and was active in church and sports. *Id*. at 112. Mr. Debbins noted that "everyone got along well and there was little conflict among his family members." *Id*. Graduating high school early, Mr. Debbins began attending college at the age of sixteen (16). *Id*. at 114. Following a short break, Mr. Debbins returned to college, graduated at age twenty-two (22), and received a commission in the U.S. Army, a

decision he made for "adventure, love of country, and wanting to be a better person." *Id*. Mr.

Debbins spent time in Russia prior to his active duty, where he met his wife, Yelena Selyutina,

whom he married in November 1997. Mr. Debbins' active military duty began in July 1998, and

he served honorably until November 2005, ultimately becoming a U.S. Special Forces Officer.

*Id*. at 115-117. Following his service, Mr. Debbins immersed himself in civilian life, transitioned

his career more towards business, and continued to raise his four daughters. *Id*.

Upon learning of Mr. Debbins' background, anyone would be wondering why and how

did a military officer, businessman, father and husband wind up in this situation. The answer

unfortunately is extremely complicated and is why Mr. Debbins is involved in one of the most

unique espionage cases in modern times. Bubbling underneath the seemingly successful life of a

patriotic American was an anguish deeply wrapped in a warped sense of reality, a naivete

stemming from suppressed feelings and misunderstandings, and a complete inability to escape

the situation. It was compromise that led Mr. Debbins to today. In order to fully grasp what took

place  in this case, the Court must understand the complete mental pathology of Mr. Debbins. To

put it simply, Mr. Debbins was and is an intelligent yet troubled man who was taken advantage

of at a young age by a foreign government and could not find a way out.

Mr. Debbins submits fifteen (15) letters of support for the Court to consider in

determining its sentence in this case. The authors of the letters range from business colleagues,

childhood neighbors, Mr. Debbins' priest and other members of his church community, his

family, close friends, and even an old college professor. Each letter gives the Court a more

complete understanding of the Peter they knew, and the honorable, caring, and intelligent man

for whom they pray the Court shows mercy. *See* Exhibits C-Q. Repeatedly, those who know him

state that the instant offense is out of character with the man they love, know, respect, and

support. *Id.*  As such, each expresses considerable surprise that Mr. Debbins committed the criminal offense in this matter, for which he has accepted full responsibility. *Id.*

Based upon Mr. Debbins' personal history and character, the nature and circumstances of the offense, and Mr. Debbins' mental pathology, Mr. Debbins respectfully requests that the Court impose a sentence significantly below the low-end of the guidelines in this case. Such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing,[1] particularly in light of Mr. Debbins' prior honorable service to this nation and non-existent contact with the criminal justice system.

## II.    THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *Id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *Gall* at 49-50, and explain how the facts relate to the purposes of sentencing.  *Id.* at 53-60; *See also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough* at 101; *Pepper* at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on

---

[1] *See* 18 U.S.C. § 3553(a).

policy considerations, including disagreements with the Guidelines." *Kimbrough*. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper* at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## III.    THE SENTENCING GUIDELINES

According to the plea agreement in this matter, the parties agree that the following Sentencing Guidelines sections apply:

**2018 Guidelines**

USSG § 2M3.1(a)(2) – Base Offense Level                                    37

4

| | | |
|---|---|---|
| USSG § 3B1.3 - Abuse of position of trust or use of special skill | | +2 |
| | Total | 39 |
| Acceptance of Responsibility USSG §3E1.1(a) | | -2 |
| Acceptance of Responsibility USSG §3E1.1(b) | | -1 |
| **TOTAL OFFENSE LEVEL** | | **36** |

Mr. Debbins has a criminal history score of zero and a criminal history category of I for sentencing purposes.  *See* PSR at ¶ 103-104.  These calculations, with a total offense level of thirty-six (36), results in an advisory Guidelines range for Mr. Debbins of 188-235 months. *See* USSG Sentencing Table.

## IV.   18 U.S.C. § 3553(A) FACTORS

### A.  The Nature and Circumstances of the Offense.

Mr. Debbins' involvement in the instant offense is extraordinarily regrettable. As he writes in his letter to the Court, "I am truly contrite and heartbroken for my failings as a man and as an American." *See* Exhibit A. In order to fully grasp what led Mr. Debbins to the instance offense, the Court must consider his entire life story, particularly his unresolved mental health issues, and how it led to his vulnerability in making the biggest mistakes of his life. *Id*.

The story begins with Mr. Debbins' mother's story. As Mr. Debbins describes it, "my mother survived Stalin's famines in Ukraine in the 1930's, which took the lives of five of her siblings." They escaped to Germany, where things got worse – "the Nazis took my mother, as a child, and her family to slave labor camps in Germany." *Id*. Mr. Debbins' believes his mother's coping mechanism for dealing with her trauma was to have as large a family as she could where they could all "live in peace, not at war." *Id*. Mr. Debbins is the youngest of the seven (7) biological children and the fifteenth (15th) out of the seventeen (17). *Id*. Although Mr. Debbins

5

explains that "it was a warm and loving home … I absorbed many of the emotional pains of my mother and siblings." *Id*. Further, many of the children adopted by his parents had special needs such as albinism, disabilities related to thalidomide, missing kidney, Down's syndrome, and schizophrenia.  Mr. Debbins had to help care for many of the children himself. *Id*. Then, "at age 10, I saw my mother begin her terminal descent to an early death with the onset of Parkinson's disease, which was caused by the excessive use of DDT in the slave labor camps." *Id*. All the while, Mr. Debbins was hiding a same-sex attraction ("SSA") and tells the Court that "my life has been a veritable hell of concealing and brutally suppressing my true self, especially when I was younger." *Id*.

It is important to note to that in Mr. Debbins letter, he regurgitates many of the details outlined in the statement of facts in this case and the interviews conducted with the FBI prior to Mr. Debbins' arrest. *Id*. Discussed in further detail below, Mr. Debbins believed that the GRU knew about his SSA "from my effeminacy, an encounter I had, and visits to adult stores." and he "feared the Army would learn of my SSA and pathologies, ending my nascent military career in shame" at a time when "don't ask don't tell" was prevalent. *Id*. Mr. Debbins "felt trapped by my circumstances and didn't know how to escape." *Id*. "I developed a passionate hatred towards the Russian government for taking advantage of me, and devoted myself to make sure others did not fall victim like I did. I wanted to disclose my contacts earlier but saw no mechanism to safely do so." *Id*. This led to continued self-torture and because "I didn't confront the mental pathologies that plagued me and my feelings against the Kremlin … I made another great mistake in 2014 … I embraced an occult belief system in which I believed I was my own God and thought I could conform to my will." *Id*. He recognizes now that his "recitations and visualizations rituals did not transform reality, but created delusions," which led to him descending "into insanity unable to

distinguish between reality and fantasy." *Id*. Mr. Debbins lists several pathologies he was suffering from for years, including insomnia, crossing moral boundaries, manic states of high energy, excessive uses of alcohol and caffeine, and fantasies about his wife and daughter working for the GRU. *Id*.

Mr. Debbins is extremely self-reflective, recognizing that he had "excellent work performance, high social standing, many friends, and a happy family," but that on the inside, "with all this psychological and physiological torture" all he wanted was to "unload these racing thoughts to pass my polygraph, without considering the legal ramifications." *Id*. Looking back, Mr. Debbins "regrets going to Russia" because he should have known better how "its nefarious government regards people as an expendable commodity, ubiquitous with no intrinsic value and I was especially vulnerable." *Id*. More powerfully, Mr. Debbins "regrets not confronting my mental illness earlier and am so heartbroken for all the pain and suffering it caused my family and country." *Id*. In his final paragraphs, Mr. Debbins exclaims that the "the Russian GRU ruined my honor and potential as an American," and asks this Court for its leniency to "restore to me what the Kremlin stole from me, my integrity as an American," so that "Americans who wish to escape a similar situation are not hopelessly trapped." *Id*.

**B. Mr. Debbins Psychiatric Assessment**









**C.   Mr. Debbins' History and Characteristics.**

Peter Debbins is beloved by his family, friends, neighbors, colleagues, teachers, and

clergy. *See* Exhibits C-Q. The letters submitted on his behalf paint a picture of a man who is well

respected, loved, and admired for his military service, his kindness, his business acumen, his faith, and his devotion to his wife and daughters. *Id*.

Peter's wife, Yelena Selyutina, tells the story of how her and Mr. Debbins met through a mutual friend while he was visiting Russia, how they fell in love, and were excited to build their lives together. *See* Exhibit C. She recalls happy memories of moving around the world with him at his various duty stations, giving birth to their four daughters, and moving to America. *Id*. Ms. Selyutina has always been proud of her husband and her family as she writes "I am always proud of him and admire what he does," and "everyone that always looks at our family says we are the best family." *Id*. They were living the American Dream and Ms. Selyutina is struggling greatly dealing with Mr. Debbins' incarceration and the realities of this case. *Id*. Ms. Selyutina describes her husband as "a very trustworthy and faithful father and husband," and as "very resilient, intelligence, and hard-working." *Id*.  She tells the heroic story of a time when Mr. Debbins was the first to stop at a  multiple casualty accident and provided CPR and direction until emergency services arrived. *Id*. Mr. Debbins also helped with casualty assistance for Americans killed in Iraq by assisting with documents, obtaining pensions, and generally providing comfort for family members who lost loved ones. *Id*. She implores the Court to "grant Peter the maximum leniency in his sentencing," and explains that "we all miss our husband and father." *Id*.

Joan Weimholt, Mr. Debbins' sister, gives further insight into their unique childhood, explaining how "we were taught high ideals and aspired to live them. We were raised in the Roman Catholic faith and strive to develop our consciences and live morally." *See* Exhibit D. At his core, she describes Mr. Debbins as "a thoughtful conscientious person who erred on the side of being too noble," and that he "never shirked from taking responsibility when needed." *Id*. This is certainly consistent with whom Mr. Debbins is today – as he stands before this Court taking

12

complete responsibility for his actions. Ms. Weimholt writes "if he considered himself guilty of anything it must have come from his strong desire to take full responsibility for his actions. Peter is honest." *Id*. Mr. Debbins "has great remorse for the hardship he has caused his family and country." *Id*. Ms. Weimholt tells the Court a story about how her daughter sustained a serious head injury where her skull was fractured in 2005 at Peter's home while their children were playing. *Id*. The medical bills were enormous and at the time, Ms. Weimholt and her family could not afford them and were unsure if their insurance would cover the expenses. Mr. Debbins offered, without anyone asking, to make a claim on his homeowner's insurance since it occurred at his home, but ultimately didn't end up needing to make the claim because Ms. Weimholt's insurance covered the incident. *Id.* Simply put, "he has a generous spirit." *Id*. She also asks the Court for leniency and states that "society will be better off if Peter is able to continue raising his family than if he were to be incarcerated." *Id*.

Josef Debbins is Mr. Debbins' brother and remembers Mr. Debbins as a "bookworm" when they were kids whose nickname was "the professor." *See* Exhibit E. Josef is proud of his younger brother, and always maintained a good relationship with him throughout his various deployments and relocations. *Id*. When Mr. Debbins moved back to Minnesota, Josef "observed Peter's dedication to his wife and children," explaining that "Peter is a wonderful father and husband, with a unique directive to the ambitions of his children." *Id*. Josef provides a unique take on Mr. Debbins' case, stating that "understanding that Peter has pled guilty to all charges … I maintain that the charges that he is truly guilty of are 'hubris' and 'self-bravado.'" *Id*. He further adds that "Peter is deeply sorry that he allowed his hubris to influence his poor decisions," and that "in his letters, he has expressed profound remorse for the things he did wrong." *Id*.

John Debbins is also Mr. Debbins' brother, served in the Peace Corps, and describes Peter as "a man who could be severely misunderstood by those lacking his sense of history and spirituality." *See* Exhibit F. John explains that "it is no surprise that Peter joined the Special Forces and I the Peace Corps," believing that they are both products of "American idealism and exceptionalism." *Id*. John "sincerely believes that Peter will continue to be a caring father, husband, and citizen," and that he is deserving of the Court's leniency. *Id*.

Mr. Debbins grew up visiting his aunt and uncle, Elaine and Fred Groshek, on their dairy farm in Wisconsin. *See* Exhibit G. They describe Mr. Debbins as a "nephew who believes 2nd best isn't good enough." *Id*. Mr. and Mrs. Groshek provide further insight into Mr. Debbins' mother's story of how she "left their home in Ukraine to go to Germany because she feared communism more than Hitler. Once they arrived, they were put on cattle cars and sent to labor camps. After they were liberated, they were sent to displaced person camps until an aunt in Milwaukee sponsored them here. Peter's mother was 14 years old. She was wise, holy, and giving human being." *Id*. As mentioned earlier, Mr. Debbins' mother's story clearly affected him on a deep psychological level. Mr. Debbins has also expressed "deep sorrow and regret for his mistakes" to the Grosheks. Nevertheless, Mr. Debbins' aunt and uncle state that even though "a crime like Peter's is very serious … I love Peter … he is family." *Id*.

Not surprisingly, Mr. Debbins has many friends who have written on his behalf and share many of the same sentiments as his family. Mr. Debbins is from the blue-collar world, and one of his longtime family friends from church, Judy Makowske, tells the Court that where they grew up, there are "people who value hard work, honesty, and sincerity." *See* Exhibit I. She believes that "this is the fabric that surrounded Peter in his formative years" and "that he is truly cut from this cloth." *Id*. Ms. Makowske used to be the Hennepin County Commissioner, and Mr. Debbins

14

used to work on her campaign when he was younger, standing out as "bright, energetic, and altruistic." *Id*. She tells the story of how seventeen (17) years after Mr. Debbins worked for her, he came to a funeral for one of her former staff members, simply to express his condolences and be there for those who have always been there for him. *Id*.

Michael Hansen, a former Marine Corps veteran who was dealing with "heavy PTSD and depression" remembers "Peter's first role in our friendship was that of a life coach." *See* Exhibit J. Mr. Hansen has "nothing negative to say" about Mr. Debbins, and "that every conversation was an inspiration to continue to grow, serve, and tap into our true life's potential." *Id*. Mr. Hansen believes deeply that "Peter has been a true blessing in my life." *Id*. One of Mr. Debbins' college professors at the University of Minnesota, Maria Schweikert, remembers Mr. Debbins "as someone who was always upbeat and eager to learn." *See* Exhibit N. Ms. Schweikert tells her own personal history in her letter, explaining that her father was a Prisoner of War in a Soviet gulag for twelve (12) years and that her grandfather was poisoned by a KGB agent. *Id*. She tells her story to illustrate how she connected with Mr. Debbins and understood the pain of his own mother's story and how that impacted Mr. Debbins his entire life. She provides context on being brought up with Eastern European values of hospitality and how Mr. Debbins "is a very good family man, good father," and that he always "demonstrates his peaceful nature towards his family and friends." *Id*. Claudia Riley, a neighbor growing up whose own family lived only a block away from the Debbins' family was "surprised" to hear about the instant offense. *See* Exhibit K. She remembers Mr. Debbins as coming over to her house to play with her son Michael, and visiting again in 2002, after her son tragically committed suicide, to pay his respects. *Id*. She always knew Mr. Debbins to be a "hard worker," and a "free thinker." *Id*. She also asks the Court for leniency for Mr. Debbins. *Id*. Anthony Catabui, a member of an

accountability group at church with Mr. Debbins, looks up to Mr. Debbins as a leader and an example by which to live his life. *See* Exhibit Q. In fact, Mr. Catabui credits Mr. Debbins with helping him bring his family closer together and "making great strides towards healing" after very difficult times. *Id*. Mr. Catabui is confident that Mr. Debbins "will continue to be a model citizen, father, husband, and a healthy, productive contributing member of society." *Id*.

Father Richard Carr, a priest at Holy Trinity Catholic Church in Gainesville, Virginia has known Mr. Debbins and his family since 2016, but he only really began to know Mr. Debbins following his arrest and detention. *See* Exhibit M. Father Carr has spoken to Mr. Debbins on two (2) occasions while he has been incarcerated and decided to write a letter in support of him for a few reasons. *Id*. In Father Carr's own words, although he does not know Mr. Debbins extremely well, he is "sincerely impressed by his care and love for his wife, Yelena, and four daughters, and his commitment to reform his life." *Id*. "Peter has shown himself to be an honorable man who cares more about his family than himself and who is taking responsibility for his past mistakes and would not repeat them" More impactful however, Father Carr tells the Court that he "would not write this letter unless I firmly believed that Peter possesses no security threat to our nation and wants to live the rest of his life as a good American citizen." *Id*.

Patrick Thoresen lived three blocks from Mr. Debbins and his family for five (5) years and says they "were good friends." *See* Exhibit H. He always believed Mr. Debbins to be "a devoted husband and family man," and that it was always "clear that he values his wife and children and their well-being." *Id*. In October 2015, Mr. Thoresen and his family were planning a trip to see Mr. Debbins and his family, and then Mr. Debbins rescinded the invitation and did not give an explanation. *Id*. It caused a rift in their friendship, but Mr. Thoresen believes that "if our visit would reveal that anything he projected about his amazing house, lovely wife, perfect

children, exciting job were not true, then he had his reason to not see us." *Id*. Mr. Thoresen writes that although Peter is "hard working, self-confident, and ambitious," he "tries very hard to be liked and to win people over to his side." *Id*. He further elaborates that Mr. Debbins "likes to present himself in a good light and doesn't readily admit mistakes." *Id*.

Stevan Becker, Mr. Debbins old boss at Trademark Transportation had the following to say about Mr. Debbins: "I found him to be very open to learning and admitting his own mistakes and shortcomings." *See* Exhibit L. This behavior from years ago corroborates Dr. Charney's psychiatric assessment of Mr. Debbins as it relates to his ███████████████████████ ██████ It further provides context to how Mr. Debbins ended up committing the instant offense and was in many ways, a prisoner in his own mind. Additionally, Mr. Becker has incredibly positive things to say about Mr. Debbins, explaining in his letter that "his integrity, reliability, and ethics were of the highest standards," and "he had good insights and instincts, and his commitment and contributions were vital to our company's growth during challenging economic times." *Id*. Mr. Debbins was "one of the hardest workers I've ever known" and "his reputation for honesty and doing the right thing was admired by others." *Id*.

Showcasing the type of father Mr. Debbins' is, his daughter Vera Debbins tells the Court just how much she misses her father and awaits his return. *See* Exhibit P. "My father and I have been really close for as long as I can remember." *Id*. Ms. Debbins writes about how Mr. Debbins is the type of person who would always "help others before himself," and how he "would always feel immense joy when he could help someone out." *Id*. But more importantly, she explains how Mr. Debbins has raised her to be a hardworking and productive member of society. *Id*. She strongly believes that "the relationship my father had with his family, his workplace, and community was always compassionate and friendly." *Id*. She tells the Court how "writing this

17

letter hurts," and that she hopes her "father will be home soon" so he could be there for her, her sisters, and her entire family. *Id*.

Lastly, Mr. Debbins best friend David DePerro has spoken to Mr. Debbins nearly every day since he's been incarcerated and considers it the "highlight of my day" when Mr. Debbins calls him. *See* Exhibit O. Mr. DePerro took it hard upon learning of Mr. Debbins arrest, and struggles to this day as he tells the Court, "I suffer gravely to think of him in jail … I miss him … and need his friendship and Christian brotherhood." *Id*. Mr. DePerro describes Mr. Debbins as having a "noble character and high ideals." *Id*. Mr. DePerro's friendship with Mr. Debbins is built in many ways upon the foundation and themes that are found in many of the other letters – that is Mr. Debbins desire to help others better themselves through his own example. "Peter was constantly advising me about how to liberate my mind from the captivity of my own harsh self-criticism." *Id*. "[Peter] has worked very hard at retraining his mind away from self-pity, negative self-image, and other thoughts that were making him miserable and holding him back." *Id*.

Mr. DePerro understands Mr. Debbins' flaws but strongly believes that should "be seen in the context of his earnest goodwill, his reason, insight, faith, and good humor." *Id*. Drawing on his own experience having his father gone for long periods during his own childhood, Mr. DePerro expressed great concern for Mr. Debbins' young children to be without their father during their most critical years. *Id*. Mr. DePerro has seen the change in Mr. Debbins throughout his entire incarceration thus far  and believes wholeheartedly that "he bears no ill will towards anyone else. He accepts the consequences of his actions and is thankful for the changes that his incarceration has worked inside of him." *Id*. Mr. DePerro discusses how loyal and devoted Mr. Debbins is to his family, and how much of a role Mr. Debbins' Catholic faith plays in his path going forward. *Id*. "It is his connection to God that will guide him on the right path, even if that

path is very difficult. He knows very well that God is with him." *Id*. Mr. DePerro implores the Court to have mercy on Mr. Debbins, and to allow him to be there for his family and to remedy the mistakes of the past by becoming part of the solution in the community rather than serve a lengthy prison sentence. *Id*.

It is clear that Mr. Debbins is a man of great integrity who made terrible mistakes. He is looked up to by his friends, colleagues, and neighbors, and loved by his family. Mr. Debbins is the type of person who is deserving of this Court's leniency.

### D.  Mr. Debbins' Damage to the United States was Minimal.

On the spectrum of espionage cases, their seriousness in nature, and damage caused to U.S. national security interests, Mr. Debbins' case is on the low-end, and counsel respectfully asserts that his sentence should reflect accordingly. Mr. Debbins completed menial tasks that the GRU gave him, like securing names of nuns from a nearby church. *See* Statement of Facts ("SOF") ¶ 12. While stationed in South Korea, Mr. Debbins provided information about his unit, but only upon being threatened  – he did not volunteer this information. *Id*. at ¶ 26. At no point did Mr. Debbins partake in any active intelligence gathering for the Russians. *Id* at ¶ 28. Again, at later meetings, Mr. Debbins provided information about his unit at Fort Polk and his Special Forces Group but did not volunteer the information. *Id*. at ¶ 34, 38. In 2008, three years after he left the Army, Mr. Debbins had subsequent meetings and provided information about his old units. *Id*. at ¶ 47. At that point, the information was over three years old. Also, in 2008, Mr. Debbins was asked to provide an Army field manual to the GRU, but did not comply with the request. *Id*. at ¶ 51, 59.

Mr. Debbins admits to the Statement of Facts in this case and wholeheartedly accepts responsibility for his actions. *See* Exhibit A. However, Mr. Debbins' case must be put into

context. This Court is extremely familiar with other such espionage cases, like that of Robert Hanssen, whose espionage activities led to both the imprisonment and deaths of Americans. Another individual, Aldrich Ames, compromised more highly classified CIA assets than any other spy in history, until Robert Hanssen came along. Both Hanssen and Ames received life sentences. Earl Pitts, with whom Dr. Charney is intimately familiar, sold secrets to the Soviets and received hundreds of thousands of dollars for his information. Mr. Pitts received a twenty-seven (27) year sentence. Brian Regan wrote letters to Saddam Hussein, Libya, and China offering to sell information for millions of dollars. He had downloaded tens of thousands of classified documents and was arrested on a plane to Switzerland with the documents. He was sentenced to life in prison after being found guilty by a jury.

Mr. Debbins' actions are not on the scale of the aforementioned individuals. Mr. Debbins provided classified information that he believed was "garbage information" and was of little value to Russia. Mr. Debbins received a bottle of cognac and $1,000 in cash which he reluctantly accepted because of fears already discussed. Mr. Debbins did not steal thousands of classified documents and offer them to the Russians – in fact he did not even provide an Army field manual which was requested.  Mr. Debbins' activities did not lead to the arrests, compromise, or death of any U.S. intelligence assets or programs. As such, considering these facts and the psychiatric assessment by Dr. Charney, Mr. Debbins is deserving of a sentence significantly below the low-end of the guidelines.

### E.  Mr. Debbins Poses Little or No Risk of Recidivism.

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Debbins does not fit the archetype of a person who will commit new criminal

offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*).  Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C).  Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Debbins' character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism.  For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases.  *See Measuring Recidivism* at 12.  More specifically those like Mr. Debbins, who is 46 years old and has no criminal history, have a recidivism rate of only 6.9 %.  *Id.* at 28.  There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Debbins would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Debbins are rarely reconvicted of a crime.  In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted.  *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May

of 2004) (hereinafter *First Offender*).  Only 11.7% of all first offenders ever find themselves

back in the criminal justice system (defined as reconviction, re-arrest, or revocation).  *First*

*Offender* at Exhibit 6.  This is Mr. Debbins' first felony conviction, and the experience taught

him a valuable life lesson to ensure he does not repeat the mistakes of the past.

It is unfortunate that the Guidelines' offense levels do not take into consideration such

data.  This data exists yet is not utilized to inform the Commission's rulemaking.  However,

without even considering the circumstances of the offense, it is apparent that Mr. Debbins is not

a person who is statistically likely to recidivate.  And when one considers such statistics in light

of Mr. Debbins' history, it is safe to assume that he will never again be arrested or charged with

an offense.

### F.  Mr. Debbins' Public Demise Serves as Adequate Deterrence to Others.

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed

to afford adequate deterrence to criminal conduct."  Arguably, the government already

substantially achieved the maximal deterrent effect of Mr. Debbins' offense simply by charging

and convicting him.  As a result, Mr. Debbins' name and the substance of his offense will be

discussed in numerous conversations and settings among family and friends and within certain

professional environments for years to come, a shameful reality from which he simply cannot

escape. In short, Mr. Debbins' public professional demise sends a strong message to anyone

foolish enough to attempt to divulge classified information.

Accordingly, Mr. Debbins, by and through undersigned counsel, respectfully requests

that the Court sentence him to a sentence of significantly below the low-end of the guidelines.

Respectfully submitted,


_____/s/_____
David Benowitz
Bar # 451557
*Counsel for Peter Debbins*
Price Benowitz LLP
409 7th Street, NW,
Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
F: (202) 664-1331
David@PriceBenowitz.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 7th day of May 2021, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via ECF to Assistant United States Attorney Thomas Traxler, United States Attorney's Office, 2100 Jamieson Avenue, Alexandria, Virginia 22314.

_____/s/_____
David Benowitz