00840577

# OFFICER EVALUATION REPORT

For use of this form, see AR 623-105; the proponent agency is ODCSPER

SEE PRIVACY ACT STATEMENT ON DA FORM 67-9-1

## PART I - ADMINISTRATIVE DATA

| a. NAME (Last, First, Middle Initial) | b. SSN | c. RANK | d. DATE OF RANK | e. BRANCH | f. COMPONENT / PMOS |
|---|---|---|---|---|---|
| DEBBINS, PETER R. | -5204 | CPT | 2001 10 01 | SF | 18A |

g. UNIT, ORG, STATION, ZIP CODE OR APO, MAJOR COMMAND
Co B, 1st BN, 10th SFG(A), Unit 30401, APO AE 09107 (USASOC)

h. REASON FOR SUBMISSION: 18 Relief for Cause

| i. PERIOD COVERED | j. RATED MONTHS | k. NONRATED CODES | l. NO. OF ENCL | m. RATED OFFICER COPY (Check one and date) | | n. PSR | o. CMD CODE | p. PSB CODE |
|---|---|---|---|---|---|---|---|---|
| FROM 2004 06 04 TO 2004 12 31 | 7 | | 1 | X 1. Given to Officer 2. Forwarded to Officer | 20050225 | SP | | EU50 |

## PART II - AUTHENTICATION (Rated officer's signature verifies officer has seen completed OER Parts I-VII and the admin data is correct)

| a. NAME OF RATER (Last, First, MI) Richardson, Michael | SSN | RANK MAJ | POSITION Company Commander | SIGNATURE | DATE 20050225 |
|---|---|---|---|---|---|
| b. NAME OF INTERMEDIATE RATER (Last, First, MI) | SSN | RANK | POSITION | SIGNATURE | DATE |
| c. NAME OF SENIOR RATER (Last, First, MI) Eaddy, John S. | SSN | RANK LTC | POSITION Battalion Commander | SIGNATURE | DATE 20050225 |

SENIOR RATER'S ORGANIZATION
1st Battalion, 10thSpecialForcesGroup (Airborne)
Unit 30401, APO AE 09107

BRANCH SF

SENIOR RATER TELEPHONE NUMBER DSN: 431-2645

E-MAIL ADDRESS john-eaddy@us.army.mil

d. This is a referred report, do you wish to make comments? ☒ Yes ☐ No, comments are attached

RATED OFFICER SIGNATURE / DATE 20050225

## PART III - DUTY DESCRIPTION

a. PRINCIPAL DUTY TITLE: Detachment Commander

b. POSITION AOC: 18A00

c. SIGNIFICANT DUTIES AND RESPONSIBILITIES: REFER TO PART VII, DA FORM 67-9-1

Commands a forward deployed Special Forces Operational Detachment-Alpha (SFOD-A) prepared to respond to special operations contingency missions throughout the EUCOM AOR. Responsible for the training, discipline, mission planning and employment of the detachment in sensitive actions which support the Combatant Commander's wartime, contingency and peacetime engagement strategies to include Direct Action (DA) and Special Reconnaisance (SR) accross the full spectrum of operational environments. Directed to maintain specialized skills to perform Unconventional Warfare (UW) and Advanced Special Operations (ASO) in support of National Command Authority and USSOCOM objectives.

## PART IV - PERFORMANCE EVALUATION - PROFESSIONALISM (Rater)

CHARACTER Disposition of the leader: combination of values, attributes, and skills affecting leader actions

a. ARMY VALUES (Comments mandatory for all "NO" entries. Use PART Vb.)

| | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|
| 1. HONOR: Adherence to the Army's publicly declared code of values | | X | 5. RESPECT: Promotes dignity, consideration, fairness, & EO | | | X |
| 2. INTEGRITY: Possesses high personal moral standards; honest in word and deed | | X | 6. SELFLESS-SERVICE: Places Army priorities before self | | | X |
| 3. COURAGE: Manifests physical and moral bravery | X | | 7. DUTY: Fulfills professional, legal, and moral obligations | | | X |
| 4. LOYALTY: Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and the soldier | | | | | | |

b. LEADER ATTRIBUTES / SKILLS / ACTIONS: First, mark "YES" or "NO" for each block. Second, choose a total of six that best describe the rated officer. Select one from ATTRIBUTES, two from SKILLS (Competence), and three from ACTIONS (LEADERSHIP). Place an "X" in the appropriate numbered box with optional comments in PART Vb. Comments are mandatory in Part Vb for all "No" entries.

| b.1. ATTRIBUTES (Select 1) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fundamental qualities and characteristics | X MENTAL Possesses desire, will, initiative, and discipline | YES | X | 2. PHYSICAL Maintains appropriate level of physical fitness and military bearing | | NO | 3. EMOTIONAL Displays self-control, calm under pressure | | NO |

| b.2. SKILLS (Competence) (Select 2) | X CONCEPTUAL | YES | X | 2. INTERPERSONAL | YES | X | X TECHNICAL | | NO |
|---|---|---|---|---|---|---|---|---|---|
| Skill development is part of self-development; prerequisite to action | Demonstrates sound judgment, critical/creative thinking, moral reasoning | | | Shows skill with people; coaching, teaching, counseling, motivating and empowering | | | Possesses the necessary expertise to accomplish all tasks and functions | | |
| | 4. TACTICAL Demonstrates proficiency in required professional knowledge, judgment, and warfighting | | | | | | | YES | X |

b.3. ACTIONS (LEADERSHIP) (Select 3) Major activities leaders perform: influencing, operating, and improving

| INFLUENCING Method of reaching goals while operating/improving | X COMMUNICATING Displays good oral, written, and listening skills for individuals / groups | | NO | 2. DECISION-MAKING Employs sound judgment, logical reasoning, and uses resources wisely | YES | X | 3. MOTIVATING Inspires, motivates, and guides others toward mission accomplishment | YES | X |
|---|---|---|---|---|---|---|---|---|---|
| OPERATING Short-term mission accomplishment | X PLANNING Develops detailed, executable plans that are feasible, acceptable, and suitable | | NO | 5. EXECUTING Shows tactical proficiency, meets mission standards, and takes care of people/resources | YES | X | 6. ASSESSING Uses after-action and evaluation tools to facilitate consistent improvement | | NO |
| IMPROVING Long-term improvement in the Army, its people and organizations | 7. DEVELOPING Invests adequate time and effort to develop individual subordinates as leaders | | NO | 8. BUILDING Spends time and resources improving teams, groups and units; fosters ethical climate | YES | X | X LEARNING Seeks self improvement and organizational growth; envisioning, adapting and leading change | | NO |

c. APFT: PASS DATE: NOV 2004 WEIGHT: 74 WEIGHT: 230 YES

d. JUNIOR OFFICER DEVELOPMENT - MANDATORY YES OR NO ENTRY FOR RATERS OF LTs AND WO1s
WERE DEVELOPMENTAL TASKS RECORDED ON DA FORM 67-9-1A AND QUARTERLY FOLLOW-UP COUNSELINGS CONDUCTED? YES NO X

DA FORM 67-9, OCT 97   REPLACES DA FORM 67-8, 1 SEP 79, WHICH IS OBSOLETE, 1 OCT 97   USAPA V2.01

| NAME | DEBBINS, PETER R. | SSN | ███-██-5204 | PERIOD COVERED | 20040604 - 20041231 |

## PART V - PERFORMANCE AND POTENTIAL EVALUATION (Rater)

**a. EVALUATE THE RATED OFFICER'S PERFORMANCE DURING THE RATING PERIOD AND HIS/HER POTENTIAL FOR PROMOTION**

☐ OUTSTANDING PERFORMANCE, MUST PROMOTE
☐ SATISFACTORY PERFORMANCE, PROMOTE
☒ UNSATISFACTORY PERFORMANCE, DO NOT PROMOTE
☐ OTHER (Explain)

**b. COMMENT ON SPECIFIC ASPECTS OF THE PERFORMANCE AND POTENTIAL FOR PROMOTION. REFER TO PART III, DA FORM 67-9 AND PART IVa, b, AND c DA FORM 67-9-1.**

I directed the relief of CPT Debbins as a detachment commander following the revelation that he made the unilateral decision to move his family in with him during a deployment to his assigned area of operation despite the fact that he was conducting a highly sensitive compartmentalized mission in support of EUCOM and USSOCOM operational objectives. Additionally, CPT Debbins provided a US government procured cell phone to his wife for her personal use. When confronted by the Non-Commissioned Officers of the detachment about his actions he disregarded their concerns about his family's presence and lied to them about the whereabouts of the cell phone.

At the very least, CPT Debbins actions constitute a gross security violation, misappropriation of government property, incredibly poor judgement, a lack of integrity and the reckless endangerment of his family. He does not possess the integrity or judgement to succeed as a Special Force Officer.

**c. IDENTIFY ANY UNIQUE PROFESSIONAL SKILLS OR AREAS OF EXPERTISE OF VALUE TO THE ARMY THAT THIS OFFICER POSSESSES. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.**

Although CPT Debbins possesses the physical stamina and the intellectual ability to communicate fluently in several languages, he has not demonstrated the strength of character we require of leaders within our Army and definitely not the qualities necessary to lead special operators.

## PART VI - INTERMEDIATE RATER

## PART VII - SENIOR RATER

**a. EVALUATE THE RATED OFFICER'S PROMOTION POTENTIAL TO THE NEXT HIGHER GRADE**

☐ BEST QUALIFIED  ☐ FULLY QUALIFIED  ☒ DO NOT PROMOTE  ☐ OTHER (Explain below)

I currently senior rate ___33___ officer(s) in this grade
A completed DA Form 67-9-1 was received with this report and considered in my evaluation and review.  ☒ YES  ☐ NO (Explain brief)

**b. POTENTIAL COMPARED WITH OFFICERS SENIOR RATED IN SAME GRADE (OVERPRINTED BY DA)**

HQDA COMPARISON OF THE SENIOR RATER'S PROFILE AND BOX CHECK AT THE TIME THIS REPORT PROCESSED

NO BOX CHECK

RO: CPT DEBBINS PETER R
471045204

SR: LTC EADDY JOHN S

DATE: 2005 03 18

TOTAL RATINGS:

RATINGS THIS OFFICER:

**c. COMMENT ON PERFORMANCE/POTENTIAL**

CPT Debbins was relived of command while deployed conducting a sensitive mission due to a lack of integrity and poor judgment. Though he is a skilled linguist and adept at cross-cultural communication, these skills do not offset his inability to make reasonable decisions. CPT Debbins has a very limited future in special operations.

**d. LIST 3 FUTURE ASSIGNMENTS FOR WHICH THIS OFFICER IS BEST SUITED. FOR ARMY COMPETITIVE CATEGORY CPT THROUGH LTC, ALSO INDICATE A POTENTIAL CAREER FIELD FOR FUTURE SERVICE.**

Company executive officer; Assistant staff officer; Language instructor. Will best serve in OPCF/74.

DA FORM 67-9, OCT 97 (Reverse)                                                                                           USAPA V2.00

00840577



**DEPARTMENT OF THE ARMY**
COMPANY B, 1ST BATTALION
10TH SPECIAL FORCES GROUP (AIRBORNE)
UNIT 30401
APO AE 09107

REPLY TO
ATTENTION OF

AOSO-SFC-F-B                                           01 August, 2005

MEMORANDUM THRU Commander, Bravo Company, 1st Battalion, 10th Special Forces Group (Airborne), Unit 30401, APO AE 09107, ATTN: MAJ Michael Richardson, Rater

FOR Commander, 1st Battalion, 10th Special Forces Group (Airborne), Unit 30401, APO AE 09107, ATTN: LTC John S. Eaddy, Senior Rater

SUBJECT: Response to Adverse OER

This writing represents my comments in response to the adverse OER I recently received.

1. Our two-man element had no status in the area we were in. Therefore, we had no ability to execute our mission.

2. The mission required me to identify and utilize personnel with ethnic and cultural ties to my areas of responsibility. My family and I have ethnic and cultural ties to the area we were in. My ethnic background is similar to that of the indigenous population and I speak the local language. My wife is a citizen of a country with cultural ties to our area of operation. However, she is a U.S. permanent resident (green card holder).

3. I received positive feedback from the Ambassador and Defense Attaché to the idea of having my family stay with me while I was in this area. Each of them understood that our activities brought no additional danger to us or those we were associated with. In addition, other members of the embassy staff and TDY personnel, like ourselves, who while conducting similar activities had their families with them. During my initial office call with the Defense Attaché he recommended that as a future FAO that I should bring my family so they can see what the FAO life is like. During my initial office call with the Ambassador he asked whether I planned on having my family with me since he knew that I would spend most of my next two years in this area.

4. My team warrant officer and I discussed the advantages, disadvantages, and implications of bringing my family in to our area of operation and agreed that it would enhance the mission.

5. When my family came to this area I informed the Defense Attaché and the Ambassador. They showed only positive responses and invited my family to numerous social functions.

00840577

AOSO-SFC-F-B
SUBJECT: Response to Adverse OER

6. Their presence created no force protection concerns. As a permanent U.S. resident and citizen of a country with cultural and governmental ties with our area, my wife had more legal rights and protections in this area than I had. Neither my wife nor my mother-in-law was required to receive a visa and register with the local authorities. If there was a U.S. embassy NEO event she had the option to participate. Or she could have used her citizenship to return to her country, or a neighboring country, or simply stayed in the area of operation. My wife also enjoyed the protection of the embassy of her country if the local government attempted to accuse her of any wrongdoing. If I were accused of any wrongdoing the U.S. embassy could not protect me, the only protection I had was as a spouse of a friendly country citizen. If a medical emergency arose they could go to a local hospital where the staff speaks their native language to receive treatment.

7. In Germany my family has had few of the legal protections and rights they enjoyed in my area of operation. The other option for my family was to move back to their home country. However, that option presented an enormous risk to our mission in our area of operation. This area is a target of agents from my family's home country. Since these agencies target the U.S. embassy in our area of operation, they would have targeted my family in their home country.

8. Their presence created no OPSEC violations or concerns. All of our activities outside the US embassy were unclassified and so my family had no way of knowing any additional information other than the information we would disclose to local nationals.

9. Their presence created no logistic demands. My wife had her own personal vehicle with driver, which we paid for from our own funds. I did give her use of an extra government procured cell-phone, but she paid for the minutes from her personal funds. The decision to let her use a government procured phone did not violate our operational perimeters. I could have given a government procured phone to a local national if it enhanced our operations, which my family's presence did.

10. I made the decision unilaterally because we are required to conduct nearly all our activities unilaterally. We are not asked to receive permission from 1-10 SFG or SOCEUR to conduct activities with local nationals, which my family members are, as long as it enhances the mission. The embassy lead member of the country team, Defense Attaché, and Ambassador are our chain of command while in country. They did not show any concern with my family being there. In addition 1-10 SFG and SOCEUR have no authority to decide how I interact with non-U.S. nationals as long as it does not violate any policies and rules and does not threaten the mission. For example, I had family members from the same country my wife is from visit me in Germany where I have daily access to highly classified information. I was not required to ask 1-10 SFG or SOCEUR for permission.

2

00840577

AOSO-SFC-F-B
SUBJECT: Response to Adverse OER

11. The nature of our mission was not highly sensitive. Our mission was to establish our presence in country. We conducted no activities that could be connected with classified operations. Our cover status only allowed us to conduct passive activities. I conduct the same passive activities when I am on leave to visit my wife's family in her home country.

12. My family's presence greatly enhanced our operations. I could interact and gain the trust of local nationals because my family was with me. Having my family with me allowed me to build relationships with local nationals. These relationships were instrumental in our team having an audience with the highest levels of the local national government.

13. When two Non-Commissioned Officers on my team expressed their discomfort (31 October 2004) with my family being in the area I took their advice and asked SOCEUR for permission. When SOCEUR said no on 02 November 2004, I agreed that my family had to leave. Since I did not want to upset the goodwill in our team I made arrangements to have my family leave as soon as possible. They left three days after SOCEUR said no to the idea of having my family with me (05 November 2004).

14. My OER contains a statement that I lied to Non-Commissioned Officers regarding the whereabouts of a government cell phone. This statement is completely untrue. The Non-Commissioned Officers at all times knew the whereabouts of the government cell phone because I told them I had given one to my wife. As previously stated, it was within operational perimeters to distribute a cell phone to enhance operations which my family's presence did.

15. I left the area on 06 November 2004 prior to my original return date of 30 January 2005 because my commander ordered me to return.

16. One of my Non-Commissioned Officers told me that the lead member of the country team did not want me conducting intelligence activities because of my wife's ethnicity and because I had too many connections to my wife's home country. He said that even if I did not bring my wife to the area my connections to my wife's home country made me unacceptable to the lead member of the country team. This contradicted the two and a half months I worked in the embassy without issue directly with the lead member of the country team.

17. My apparent unsuitability was only raised at the end of a successful mission. When I arrived in the area our program was doing nothing. We had no placement, no access, and no contacts. We had no status in the embassy and had nothing to offer the host nation. Because of my activities we had successfully established placement, access, and contacts. We had succeeded despite all our obstacles. As a result the lead member of the country team wanted to remove me from the area because we succeeded where her agency had not. In two months in country I was briefing high-level local national government

3

00840577

AOSO-SFC-F-B
SUBJECT: Response to Adverse OER

officials while she and her predecessor had not even had an audience with their counterparts during their respective tenures.

18. Other US government agencies have bitterly opposed our activities and have repeatedly undermined our whole program through leaks and restrictions. Our program's success made me a target for bias and retaliation by removing me from the area.

19. I question whether the lead member of the country team was truthful about my unsuitability based on my connections or having my family with me. One communication specialist who works in the US embassy and has oversight over all classified electronic correspondences has a wife from the same country as my wife. His wife repeatedly travels to and from the capital of this country. This person's spouse is not even a US permanent resident. This represents a blaring double standard and calls into question the bias and motive of my removal from my position.

20. I received no orders that indicated I was not allowed or prohibited from having my family accompany me on this assignment. As soon as I discovered that there might have been a problem, I promptly asked the appropriate authorities about it. Further AR 55-46 §1-4(a)(2) states, "The Department of the Army cannot preclude family members from traveling at their own expense and residing in the vicinity of a soldier's duty station outside CONUS. All concerned must recognize that a soldier's family members have the same travel privileges as other U.S. citizens." Without specific orders to the contrary, my wife was free to travel to my assigned area and reside with me.

21. On two occasions, soldiers in our unit had their spouses visit them while they were on highly classified intelligence missions to another country with a hostile environment. These soldiers did not inform 1-10 SFG or SOCEUR of their actions. With one soldier, the chain of command was informed about the spouse's (then fiancée) visit and they did not take adverse action against him. In my situation the environment was not hostile but my chain of command is taking adverse action against me.

22. If I had been single and met a local national female, and had a similar arrangement that I had with my wife, this would not have been an issue. Therefore, the action of my command to relieve me was arbitrary, grossly unjust, and reflects their bias towards my success.

23. In a SOCEUR directed investigation against me to determine whether I violated any policies, failed to secure classified information, or adversely affected the mission, the investigator, Major Bownas, did not even bother to question the DOD personnel who spent the most time with me in Azerbaijan. These personnel could demonstrate how my work enhanced US interests and had visibility on my interactions with my family which did not compromise any classified information. The team warrant officer gave the name of a lead person to the investigator saying that this person had the most visibility on my

4

· 00840577

AOSO-SFC-F-B
SUBJECT: Response to Adverse OER

activities. His failure to question them clearly shows that the investigation and my commander's intentions were strictly to defame me and not determine the facts.

24. My commander accuses me of acting unilaterally, while at the same time unilaterally ordering me to leave Azerbaijan with out receiving permission from SOCEUR. This decision to relieve me of command could only be made by a general officer.

25. Currently, USSOCOM is making arrangements with other government agencies to allow personnel in similar situations to have their families with them while on assignment given that it does not harm the mission. My family's presence actually assisted in the success of my mission. The fact that I am being arbitrarily punished for a policy that is in the process of being implemented further denotes the bias and current injustice I am suffering.

26. Ultimately, my actions to have my family with me were brought about by my desire to succeed at our mission. Tactics, techniques, and procedures which may have worked in previous or different environment obviously did not work in Azerbaijan. The people who disagreed with my decision failed to offer any alternative methods for us to succeed at our mission. Our commanders expected us to succeed but refused to allow us to try different methods because they are unwilling to change the traditional failed ways of combating our enemies.

27. In conclusion, I respectfully ask that my rater and senior rater take into account my above statement, as it is my honest assessment of the situation, and withdraw the adverse marks and language in this OER.

PETER R. DEBBINS
CPT, SF

5

5/05  5/05